For the reasons assigned, the judgment is affirmed.

O'NIELL, C. J., is recused.

9 So.2d 481

### In re GRAY'S SUCCESSION.

No. 36327.

June 29, 1942.

Rehearing Denied July 20, 1942.

Albert E. Bryson, of Shreveport, for appellants.

John M. Shuey and Foster, Hall & Smith, all of Shreveport, for appellees.

HIGGINS, Justice.

Three of the descendants of Silas Gray instituted this proceeding under the authority of Articles 927–933, inclusive, of the Revised Civil Code, to have themselves recognized as irregular heirs of the deceased and, as such, to be placed in possession of his estate, to the exclusion of his natural child and other descendants of the deceased's natural children, against whom the plaintiffs (a grandchild and two great grandchildren) have pleaded the prescription of thirty years under the provisions of Article 1030 of the Revised Civil Code.

The petitioners alleged that Silas Gray was a slave; that during slavery he cohabited with one Susan Wilson, who was also a slave; that of their union five children were born; that Susan Wilson died prior to the emancipation of slaves in 1863; that the children were duly acknowledged by Silas; that on December 28, 1867, Silas married Mahalie Richardson; that the property owned by Silas at the time of his death in July, 1910, was purchased during the existence of the community with Mahalie Richardson, who died in 1881; that Mahalie Richardson was survived by two children, Henry and Richard, issue of her marriage with Silas; that both of these children died without issue before the death of Silas; that Silas inherited Mahalie Richardson's one-half interest in the community property and became the sole owner thereof; that Silas died without leaving any legitimate ascendants, descendants, or collaterals; that two of the acknowledged natural children of Silas, namely, Milton and Nelson, predeceased him and, therefore, their descendants have no right of inheritance from Silas; that the present proceeding is the only one that has ever been filed by any of the natural heirs to be recognized and placed in possession of the property; that Lizzie Gray was the sole surviving child of Silas and was approximately seventy years of age (in January, 1941) when this suit was instituted; and that the failure of herself and the other offspring of decedent's natural children to accept Silas' succession within the prescriptive period of thirty years is now a bar to their doing so. Some of the defendants were represented by a curator ad hoc and others by their own counsel.

In the answer filed by the defendants, the heirs of Milton Gray, they admitted the genealogy set forth in the petition. They denied that Susan Wilson was a slave and that she died prior to the Emancipation Proclamation and averred that all of the

children of Silas Gray were legitimate and thereby all of their descendants were regular heirs.

In a supplemental answer, the same defendants averred that since the death of Silas Gray, all of his heirs, from time to time, occupied the 240-acre farm left by him; that they cultivated the land; that all of them paid the taxes due thereon; that they all recognized each other as joint owners of the property; that in 1936 all of the heirs of Silas Gray, except the offspring of Milton Gray, entered into an authentic recorded act of lease of the property for oil and gas exploration; that at that time all of the heirs employed counsel to open the succession of Silas Gray, at which time they recognized each other as regular heirs; that in 1936, they entered into mineral sales, thereby recognizing each other as legitimate offspring; that because of the statements contained in the authentic acts of lease and mineral sales, as well as the allegations contained in the petition in the present suit, the plaintiffs are estopped to deny that the defendants are legal heirs of the decedent.

There was judgment in favor of the plaintiffs as prayed for, and the defendants, the heirs of Milton Gray, have appealed.

The suit involves the legitimacy of heirs or their capacity to inherit from Silas Gray. There are three points to be decided: (1) Whether or not the testimony of the plaintiffs' witness was admissible as an exception to the hearsay rule; (2) Whether or not such testimony, if admissible, was of that character and amount necessary to destroy the presumption of legitimacy; and

(3) whether or not the plea of estoppel is well founded.

When Alfred Burton, plaintiffs' witness, stated that he was told he was born in 1865, and that he had no personal knowledge of the affairs of Silas Gray and Susan Wilson before that time or for several years subsequent thereto, counsel for the defendants objected on the ground that his recollection of what the "old folks" in the community might have told him was hearsay evidence and inadmissible. The trial judge ruled adverse to the defendants. The objection went to the effect and not the admissibility of the testimony, because in the Succession of Marcour, 180 La. 129, 130, 156 So. 198, the Court held that there was an exception to the general rule against the admission of hearsay testimony in cases involving pedigree. Such hearsay evidence is admissible to prove not only descent and relationship, but also facts as to birth, marriage and death, and the dates when the events occurred.

The only witness produced by the plaintiffs to show that Silas Gray and Susan Wilson had not been married and that she died before the emancipation of slaves in 1863, was Alfred Burton, an aged colored preacher, whose sister had married Silas Gray's eldest son, Nelson. He testified that he had no personal knowledge as to whether or not Silas Gray had ever married Susan Wilson, when their children were born, or when she died; that all he knew about those matters was what "the old folks" told him; that Silas Gray and Susan Wilson were slaves owned by John Page and were kept on his plantation in

Caddo Parish; that it was generally understood that Susan was Silas' wife during slavery time and up to the time of her death; that there were five children born to them during slavery time; that Susan died during slavery time; that he had never heard the legitimacy of any of Silas Gray's children questioned or even discussed; that he did not know whether or not Silas and Susan were married but had never heard anyone say that they were not married; that Silas Gray, who was regarded by everybody as a "mighty good man", had always publicly treated all of the children as if they were his own children and reared them as such on his farm, where they all lived together; that no one ever doubted that they were his children or questioned their legitimacy; that after Silas' marriage to Mahalie Richardson (on December 28, 1867) the father and the children lived on the farm with the stepmother and her two boys, issue of her marriage with Silas; that all of the children were reared and treated alike as the legitimate offspring of Silas; that after the stepmother's death in 1874, the family continued to live on the farm together; that after the father's death in July, 1910, most of the surviving children and offspring continued to live on the farm as joint owners, farming together and paying the taxes; that no question ever arose, until the present suit, that any of the children were not legitimate; and that all of the children had the surname, Gray.

William Allen, also a witness for the plaintiffs, testified that he was seventy-three or seventy-four years of age and that he had lived about a mile south of Silas

Gray's place and had known Silas all of his life; that he did not know Silas Gray's wife, Mahalie Richardson, but did know Silas' seven children, who lived together as one family on the place; that Silas died on his farm and that his children and their children have occupied the place since then; that Silas always recognized the children alike in public and private life as his own children and treated and reared them that way; that the children attended school and Sunday school; that Silas referred to them as his boys and girl; that all of the children bore the name of Gray; and that he could not be positive when Silas Gray or any of his children died.

Article 952 of the Revised Civil Code provides:

"The incapacity of heirs is not presumed. He who alleges it must prove it."

■ In Jackson v. United Gas Public Service Co., Inc., 196 La. 1, 198 So. 633, 640, the Court, in its opinion on rehearing, quoted with approval from the Succession of Curtis, 161 La. 1045, 1051, 109 So. 832–834, as follows:

" 'The presumption in favor of marriage and the legitimacy of children is one of the strongest known to the law, and in favor of a child asserting its legitimacy this presumption applies with peculiar force.' "

See, also, Succession of Kneipp, 172 La. 411, 134 So. 376; 7 C.J. 949; 10 C.J. S., Bastards, § 11.

In the case of John Blasini et al. v. Succession of Silvestre Blasini, 30 La.Ann. 1388, the plaintiffs, as children of the first

marriage of Silvestre Blasini, claimed to be forced heirs and entitled as such to their proportionate share of their father's estate. The defendants, the widow and son by second marriage of the deceased, denied that the plaintiffs were issue of the deceased's first marriage with Isabella Barera, and that they were legitimate children. The plaintiffs offered testimony tending to show that their deceased father had lived with their mother as husband and wife; that the children were the offspring of these parties; and that the children were treated and reared as the legitimate offspring of the couple. The defendants' evidence tended to show that the deceased had stated on several occasions that he had not married Isabella; that there was an impediment to their marriage because she was a person of color; that he mistreated her and she was compelled to bear his mistreatment because she was not married to him; that there was no direct evidence to show that the couple had been married in Mexico; and that he had married the defendant widow within three months after the date of the death of Isabella.

In holding that there was a presumption of marriage and legitimate descent, which had not been destroyed by the evidence offered by the defendants, the Court stated:

"The law will not tolerate the presumption that a man and a woman who live together, publicly, as husband and wife, are really living in concubinage in violation of the law and of public decency. From certain established facts certain legal presumptions are deduced; and where it is proven, as in this case, that the parties from the time of their first appearing together in the community in which they made their permanent domicile, publicly cohabited, assuming to be husband and wife, without separation or interruption until death intervened: that the woman bore the man's name, and he called her his wife, and introduced her as his wife, and declared that he had married her in the land of her birth: where they present their offspring to the world as their children, give them the surname of the father, have them baptized as their children, and rear, and care for, and educate them as such, the law accords to the man and the woman and to their children a legal and social status, based upon the presumption of marriage, the consequence of which is the presumption of legitimate filiation and descent, which imposes on those who assert the contrary the burden of destroying that presumption. It is not going too far to say that the entire conduct of Blasini and Isabella created, in favor of their children, a presumption of legitimate descent, which could be destroyed only by proof that they were not actually married, or that there was some legal impediment by reason of which their marriage was legally impossible.

"This presumption does not sanction voluntary cohabitation, nor elevate concubinage, of whatever duration, to the dignity of marriage. When it is said that marriage may be proven by reputation, the meaning is that the acts and conduct of the parties, as established by satisfactory proof, authorize and create the presumption that they were actually married, with all the formalities required to constitute a

valid marriage by the law of the place at which it is reputed to have been solemnized; and this presumption is such that it yields only to proof that there was no such marriage, or that it was void because of some nullity established by law.

"If a man or woman so circumstanced, to gratify some whim or caprice, or to accomplish some settled purpose, should deny the reputed marriage, a moral estoppel would intervene, and forbid the falsifying of their acts and conduct by such denial.

"During the entire cohabitation of Blasini and Isabella they were apparently living in the observance of the obligations of the contract of marriage; and their acts and conduct are not compatible with any other theory than that they were actually married, in Mexico, before Isabella came to New Orleans. We must, therefore, regard the plaintiffs as their legitimate children, and forced heirs of their father, Silvestre Blasini. As such, they are entitled to participate equally with their paternal brother, Silvestre Blasini, Jr., in that portion of the succession of their father, the two thirds, which he was forbidden by law to dispose of by will to their prejudice."

In the Succession of Tyson, 186 La. 516, 531, 172 So. 772, 777, the Court stated:

"It is the well-established jurisprudence of this State, in the absence of better evidence, that a marriage may be circumstantially established by the fact that a man and woman have, for a considerable time, openly lived together as man and wife and so conducted themselves toward each

other as to enjoy a reputation among those with whom they came in contact as being husband and wife. Such cohabitation and reputation of a man and wife are presumptive evidence of the marriage. Succession of Joseph Llula, 41 La.Ann. 87, 6 So. 555; Succession of Anderson, 176 La. 66, 145 So. 270, and cases therein cited."

In the instant case the plaintiffs' own evidence shows that during the entire time that Silas and Susan lived together, or until the time of Susan's death, they were publicly considered and regarded as husband and wife; that there were five children born of their union, who were considered, treated and reared as their children; that the legitimacy of these children was never questioned; that the Emancipation Proclamation, which was signed in September, 1862, became effective January 1, 1863; and that Silas Gray married Mahalie Richardson on December 28, 1867, or five years after he was emancipated.

There is nothing in the record to show that, after January, 1863, Silas Gray and Susan Wilson did not continue to openly live together as man and wife and so conduct themselves towards each other as to enjoy the reputation in the community and among people with whom they lived of being husband and wife, with the exception of the testimony of Alfred Burton. He stated that Susan Wilson died, according to what "the old folks" told him, during slavery time.

The cross-examination of this witness clearly shows that he did not know whether Susan died before the War ended or not, and that he did not know whether she died

before or after 1863. In reply to the question as to when slavery time ended, he answered: "They told me out there, told me it was in June of '65." He refused to fix any approximate date of the death of Susan. When he was first placed on the stand and asked how old he was, he answered twice that he was "sixty-six", and later he stated that he meant "seventy-six". In the plaintiffs' petition the age of Lizzie Gray, the youngest child of Silas and Susan was given as about seventy years. Mere subtraction shows that if she were seventy years of age at the time the suit was filed in January, 1941, she was born after the Emancipation Proclamation became effective in January, 1863, thus showing that Susan Wilson was still alive and living with Silas as his wife after their emancipation.

Contrary to this allegation in the petition, Alfred Burton testified that Lizzie Gray was about eighty years of age, or older than he. His statement is in no way corroborated either by testimony or documentary evidence as to when Lizzie Gray was born or when Susan Wilson died. Again, Alfred Burton stated that Mahalie Richardson died in 1874, but the petitioners allege that she died in 1881.

The defendants introduced in evidence copies of authentic mineral leases and sales made by the plaintiffs with all the other descendants of Silas Gray, except the heirs of Milton Gray, and the legitimacy of the offspring of Susan Wilson and Silas Gray was never questioned. At that same time, a number of the heirs were attempting to have the succession of Silas Gray opened by an attorney and no one ever questioned or doubted the legitimacy of any of the children of Silas Gray and Susan Wilson. Under these facts and circumstances, it is our opinion that the plaintiffs did not successfully bear the burden of proof of showing the incapacity of the heirs of Silas Gray or that they were not his legitimate children.

As we have reached the conclusion that the plaintiffs were unsuccessful in their attempt to overcome the presumption of legitimacy of the defendants, the provisions of Article 1030 of the Revised Civil Code are inapplicable to the rights of the heirs to accept the succession of their deceased father, grandfather or great grandfather, respectively. Dew v. Hammett, 150 La. 1094, 91 So. 523, and Generes v. Bowie Lumber Co., 143 La. 811, 79 So. 413.

In view of the above opinion it is unnecessary to consider the plea of estoppel.

For the reasons assigned, the judgment of the district court is annulled and set aside and the case is remanded to the district court for further proceedings consistent with the views herein expressed. The costs of this appeal are to be paid by the plaintiffs, all other costs to await the final determination of these proceedings.

O'NIELL, C. J., does not take part.