85 So.2d 528 (1956)
Succession of Robert M. WHITE.
No. 20576.
Court of Appeal of Louisiana, Orleans.
February 6, 1956.
Rehearing Denied March 5, 1956.
Writ of Certiorari Denied May 7, 1956.
*529 Philip Gensler, New Orleans, for W. Sommer Benedict, Public Administrator for the Parish of Orleans, appellant; W. Sommer Benedict, Public Administrator, New Orleans, in pro. per., Kenneth C. Barranger and Philip P. Spencer, New Orleans, of counsel.
Moise S. Steeg, Jr., and Walter F. Marcus, New Orleans, for White Estate, Inc., appellee.
McBRIDE, Judge.
This is the second time this matter has been before us. We considered it before on a motion to dismiss the appeal. See 79 So. 2d 755.
The initial question presented is whether it was proven by competent evidence that Peter Joseph White, who is about 80 years of age and resides in Dublin, Ireland, is the nephew and sole and only heir at law of the decedent. The appeal was taken by the Public Administrator for the Parish of Orleans from a judgment which recognizes Peter Joseph White as decedent's sole heir and sends White Estate, Inc., into possession of the only remaining asset of the succession which is a certain fractional section of land situated in the Parish of Plaquemines, as the assignee of Peter Joseph White (through Nicholas D. Olivier).
The evidence consists of the depositions of Peter Joseph White and three other persons who reside in Dublin, Ireland, taken under commissions, and the testimony of several witnesses residing in New Orleans taken in open court, as well as the official certificate of decedent's death, newspaper death notices, contemporary press articles and the record of decedent's naturalization in 1901 by the Civil District Court for the Parish of Orleans.
The mass of evidence shows that decedent was a native of Dublin, Ireland; we are satisfied that he was a bachelor who lived alone in a room at 825 Baronne Street, New Orleans; that he left no descendants and never adopted anyone. We gather from the record that the decedent at one or more times lived in Plaquemines Parish. Data taken from the naturalization proceedings above alluded to reflects that the place and date of his birth was County Dublin, Ireland, December 22, 1848; he arrived in the United States at New Orleans in the year 1865; when naturalized he gave his residence as No. 437 Chartres Street.
Robert M. White died intestate in Hotel Dieu on July 20, 1928, and his succession was opened the very next day by an alleged creditor who sought to be appointed administratrix. Ultimately, letters of administration were issued to the public administrator on January 25, 1929.
Peter Joseph White "a citizen of Dublin, Irish Free State," first appeared in these proceedings on October 30, 1931, when there was filed on his behalf a petition alleging that he is decedent's nephew and sole and only heir at law and praying for recognition as such and for possession of the effects constituting decedent's estate. Although *530 this proceeding was taken contradictorily with the public administrator and the attorney for absent heirs, nothing further was done with reference thereto.
Peter Joseph White next made an appearance on November 5, 1948, as "heir of decedent" in opposition to an application which the public administrator had made for authority to sell the fractional section of land in Parish of Plaquemines at private sale. Oppositions were also filed by several other persons, but the issues raised were never tried and the succession lay dormant until White Estate, Inc., entered the proceedings in 1953 praying for possession of the land as the assignee of Peter Joseph White (through Nicholas D. Olivier).
The assignment by Peter Joseph White to Nicholas D. Olivier and the one by Nicholas D. Olivier to White Estate, Inc., are a part of the evidence and after a close examination of them, we do not find that they are other than in good order. Peter Joseph White for a stated consideration assigned and transferred all of his right, title and interest in and to the Succession of Robert M. White to Nicholas D. Olivier, by act under private signature duly acknowledged before a Vice-Consul of the United States at Dublin, Ireland, on October 29, 1948. On May 10, 1951, by an instrument acknowledged before a local notary public, Nicholas D. Olivier in turn sold all of his right, title and interest in the Succession of Robert M. White to White Estate, Inc., which is a Delaware corporation authorized to do business in Louisiana. This former document came in for some discussion. Counsel for the public administrator say a discrepancy exists as between its date and the acknowledgement thereon, but we fail to find any such variance as is alluded to by counsel and we think they are in error.
The public administrator contends (1) that the heirship of Peter Joseph White may not be proven by hearsay evidence, (2) that even if such evidence is admissible it falls far short of proving his heirship, and (3) that since Peter Joseph White is a citizen of the Republic of Ireland, the provisions of Art. XIX, § 21, of the Constitution of Louisiana of 1921, LSA, render him incapable of owning or inheriting real property situated within the state.
There is no dispute that under the law of Louisiana the burden is upon one claiming to be heir of a decedent to prove the fact. See C.P. art. 1003; Succession of Derigny, 128 La. 853, 55 So. 552; Succession of Townsend, 40 La.Ann. 66, 3 So. 488; Jones v. James, 12 La.App. 224, 125 So. 761.
Peter Joseph White is the son of Daniel Joseph White and Jane White, formerly O'Connell; he was born on September 18, 1876. His testimonial evidence is contained in two sets of depositions given before a Vice-Consul of the United States at Dublin in 1954 and 1955. The second depositions are in amplification of the first. Peter Joseph White stated that he had never seen his uncle, Robert M. White, and only learned from his father "as I was being reared up" that he had an uncle named Robert M. White who "went out to the United States as a young man." His father corresponded with the uncle in America and his uncle used to send money to his father "about 30 or 40 pounds at a time."
Peter Poseph White stated that he once sent a letter to his uncle informing him of the death of his father, but that he never received a reply. When asked if he could remember to what address the letter had been sent, Peter Joseph White replied: "I do. Number 12 Chartres Street, Parish of Plaquemines, New Orleans."
Peter Joseph White tells of his having been notified by an attorney in the United States, whose name he could not recall, that Robert M. White had died in a hotel room in New Orleans in about 1908, but as he had not kept the letter he was unable to produce it. The words "in about 1908" must immediately attract one's attention because it is a well-established fact that Robert M. White died in the year 1928. However, in his second depositions Peter Joseph White changed his first statement by saying that the attorney had informed *531 him that his uncle had died in 1928. He explained that in answering the first interrogatories he became confused as between the year of his marriage and the year of his uncle's death. We might say here that it is perfectly understandable how such confusion might arise in the mind of a man nearly 80 years of age under the stress of giving his testimony in a judicial proceeding. Nor does the statement that the attorney in America advised him that his uncle's death had occurred in a hotel room assume any particular significance, because we believe it a most natural thing that a person who knew nothing of the nature of Hotel Dieu would assume that the institution was a hotel rather than a hospital.
According to Peter Joseph White, some 20 or 25 years ago a detective who "had some American papers" sought him at a former address in Dublin. Upon learning of this, White went to the police barracks and asked the detective "what he wanted with me." The detective, after asking his name, wanted to know if there was anyone in America "belonging to" him. Peter Joseph White stated that he told the detective he had an uncle in America named Robert M. White whose address was Number 12 Chartres Street, Parish of Plaquemines, New Orleans, whereupon the detective told him "you are the man."
The next thing that happened was his receipt of the American attorney's letter containing the advice that Robert M. White had died in a hotel. In the letter the attorney "wanted me to put my things into his hands but I did not." Peter Joseph White then went on to say that his wife worked for a man named Wagner who introduced him to his own solicitor who took the case, but that this solicitor, who has since died, "did not get to carry on very far." Next came a visit from a solicitor named McGrath who "took up the case and it was going on that length of time, until there was an action started in America and he showed me slips out of the newspapers from America about documents and all the rest." Peter Joseph White states that the attorney in America afterwards notified McGrath that the case was closed as "it would not be worth going on * * * and you can see where the expenses are going."
Sometime during 1955 White Estate, Inc., sent an attorney-investigator from New Orleans to Dublin to conduct a search for some official records showing the kinship existing between Peter Joseph White and Robert M. White. This attorney testified that his quest for the official records was fruitless for the reason that the vital statistics in Dublin had been destroyed by fire. Peter Joseph White's daughter-in-law, who testified under commission, made mention of the fact that the customhouse in Dublin where the records were kept burned down sometime late in the year 1954.
In his depositions Peter Joseph White gives the genealogy of the White family pertaining to his relationship with Robert M. White so far as he knew it from personal knowledge or as transmitted to him by his father. He was interrogated step by step concerning this relationship, and the substance of his testimony is that Robert M. White was a child of Robert White and Ann Kelly, who had been married but once and then to each other and who both predeceased Robert M. White. Besides Robert M. White there was born of the marriage between Robert White and Ann Kelly, three other children, one a daughter bearing the name Ann White, and two sons named John White and Daniel Joseph White, the latter being the father of Peter Joseph White. Both Ann White and John White died prior to the death of Robert M. White, unmarried, intestate, and without descendants. Daniel Joseph White, who also predeceased Robert M. White, had been married but once and then to Jane O'Connell, this being the only marriage for each, from which two children were born, namely, Peter Joseph White and an unnamed child who died in infancy.
According to his statements, Peter Joseph White is the nephew and sole heir at law of Robert M. White.
Patrick and Bernard White, sons of Peter Joseph White, also testified under commission before the Vice-Consul. Patrick remembered *532 the incident of his father receiving the letter from an attorney in the United States; he thought this was sometime between 1928 and 1932; the letter conveyed information regarding the death of Robert M. White. Bernard White recalled that a police sergeant called to visit his father and of his father saying "some relation of his died in America." Bernard White also said that his father received a letter from a solicitor in Dublin whose name was McGrath with reference to Robert M. White's estate.
The above constitutes just about all of the pertinent evidence emanating from witnesses in Ireland, and if the circumstances were such that this evidence stood without corroboration, we, perhaps, would feel constrained to hold that it was insufficient to support the judgment of possession. But there is other evidence in the record which must be taken into consideration in determining the question of Peter Joseph White's kinship and heirship.
Three reputable members of the legal profession, one an Associate Justice of the Supreme Court of Louisiana, took the witness stand and testified that they had been acquainted with Robert M. White and remembered him well.
Henry E. Fallon, who commenced the practice of law in 1924, was the attorney who opened Robert M. White's succession in 1928 on behalf of the creditor who sought to be appointed administratrix. Mr. Fallon stated that he became acquainted with Robert M. White through Josiah Gros, also an attorney, and that after Gros' death "Old Man White" meaning Robert M. White, who had been Gros' client, paid about a dozen visits to Fallon's office. Fallon says: "He'd wait out in the waiting room. When I was finished he'd come in the office and shoot the bull." Fallon claims that in the course of their conversations Robert M. White mentioned to him that he had only one living relative, a nephew in Ireland, whose name was Peter Joseph White, the child of his predeceased brother. Fallon is certain he wrote a letter to the nephew, Peter Joseph White, in Dublin informing him of his uncle's death with the expectation that he might be employed by Peter Joseph White to represent him in the succession proceedings. The only reply he says he received was a letter from a priest in Dublin informing him that Peter Joseph White was ill as the result of excessive drinking.
Counsel for the public administrator express their disbelief that the decedent ever told Fallon of the existence of Peter Joseph White, or of any relative in Dublin, and they infer that Fallon learned of the existence of Peter Joseph White only from other sources and at a much later time.
A reading of his testimony shows that notwithstanding a rigorous cross-examination, Fallon steadfastly insisted that he knew the name of the decedent's nephew because the decedent gave the information to him. We do not think it at all strange that Fallon was able to retain in his memory for a period of twenty-five years the name Peter Joseph White, for he seems to be a man of discerning mind and keen memory. Among other things he was able to give a minute and perfect description of the decedent, Robert M. White, even as to his fair complexion and the color of this eyes which Fallon said were blue like his.
The description Fallon gave of the decedent coincides in all material respects with the physical description of the decedent as given by Justice E. Howard McCaleb, Jr., who was called as a witness by White Estate, Inc. Justice McCaleb recalled that decedent had a fair complexion and "light blue eyes."
There is absolutely nothing in the record that could cause us to discount what Fallon said. To disregard his testimony would be to say he was guilty of perjury. It would be most reasonable to believe that decedent, who was a friendly but, perhaps, lonely old man, confided to Fallon at some time or other during their conversations that he had the nephew in Ireland. That decedent was given to spending his time in his lawyer's office is not only to be seen from the testimony of Fallon, but the fact also appears from the testimony of Justice McCaleb who said that Robert M. White "spent most of *533 his days hanging around our office. * * * I guess throughout the years we always accumulate one or two clients that do that." The decedent at one time had been a client of the law firm of McCaleb & McCaleb of which Justice McCaleb was then a member.
John Kenny, a member of the local bar who was associated with Fallon in 1928, remembers several visits that Robert M. White made to the office to see Fallon. He stated that after Robert M. White died, the matter of his estate was discussed by Fallon and the late James Brittingham, the latter being the then attorney for the public administrator. Kenny was under the impression that the two attorneys were attempting to contact White's heir in Ireland. Fallon also made reference to Brittingham in his testimony and stated that Brittingham told him that he had written to Peter Joseph White but that the advice he received from Ireland was that White was "incapable."
Turning our attention to the succession proceedings themselves, we find that on October 30, 1931, when he filed the petition for recognition as heir and for possession of the succession effects, Peter Joseph White was represented by the law firm of McCaleb & McCaleb, as his "special agents and attorneys-in-fact, under and by virtue of a power of attorney executed in their favor by petitioner, before B. M. Hulley, Consul of the United States of America at Dublin, Ireland, as will more fully and at large appear by the said power of attorney which is annexed hereto * * *." It is a proven fact that the Peter Joseph White whose signature appears on the power of attorney is the same Peter Joseph White who made the assignment to Nicholas D. Olivier some seventeen years later. It was also shown that the Peter Joseph White who signed the depositions in 1954 and 1955 is the same person who had executed the power of attorney and the assignment. All this was testified to from the witness stand by a handwriting expert who made examination of all the documents.
Justice McCaleb remembered nothing of the petition, and we take it that it was the late Mr. E. Howard McCaleb who handled the matter, especially since it was he who made oath that all of the allegations of fact are true according to his knowledge and belief.
We notice that the petition contains these allegations:
"That petitioner, Peter Joseph White, is the sole and only son and heir of Daniel Joseph White and Jane O'Connell, both residing, prior to their respective deaths, in the City of Dublin, Ireland; that said Daniel Joseph White and his wife, Jane O'Connell, were married in the year 1870 at Drogheda, Ireland, and that they lived in the District of Ballybough, Dublin, and later at Conliffe Avenue, Dublin, where petitioner's said father, Daniel Joseph White, died over thirty years ago, and petitioner's mother died at St. Vincent's Hospital, Dublin, in 1881. That petitioner, Peter Joseph White, was born in Dublin on May 24th, 1875; that on the death of his said father and mother he was the sole surviving child and heir at law of his said father and mother, and inherits by representation of his said parents.
V.
That petitioner's said father, Daniel Joseph White and the decedent, Robert Michael White, were brothers, and the said Robert Michael White at the time of his death left your petitioner, Peter Joseph White, his nephew, as his sole and only heir at law."
In that the allegations are so specific, we are strongly inclined to the belief that when they were made, their author, Mr. McCaleb, had in his possession documentary proof in support thereof. It must be remembered that this was a time long prior to the destruction of the customhouse at Dublin by fire.
We are satisfied that the solicitor named McGrath, who called at the home of Peter Joseph White, was Mr. McCaleb's correspondent in Dublin. We say this because Peter Joseph White explained that McGrath *534 "took up the case" and after "it was going on that length of time," McGrath heard from an American lawyer to the effect that "the case was closed" as "it would not be worth going on any further." This would all dovetail with the circumstances shown by the proceedings in the record. There was good and sufficient reason why Mr. McCaleb did not take further steps after the petition for possession was filed, because it then appeared that the only asset that belonged to decedent's estate was an insignificant amount of cash. Unquestionably Peter Joseph White was referring to a letter that Mr. McCaleb had written to McGrath at a time when it was not known by anyone interested in the succession that Robert M. White had left the fractional section of land which was later inventoried as an asset of the succession.
The evidence discloses that in December 1928 a letter addressed to "Clerk of the Probate Court, New Orleans, Louisiana," was sent by an attorney in Portland, Oregon, named Schwabe inquiring if there was "in the course of probation" an estate of one Robert M. White and for such information in connection therewith as could be given. Evidently this letter found its way into the hands of A. W. Newlin, the then public administrator, because Newlin wrote to Schwabe stating that he was contesting for the right to administer the succession and that the estate, consisting of swamp land in Plaquemines Parish, was "more or less a legal tangle." Shortly thereafter Schwabe had the law firm of Terriberry, Young, Rault & Carroll of New Orleans investigate the succession on behalf of Peter Joseph White of Dublin, Ireland, and there followed over a period of about two years the passage of considerable correspondence between the Terriberry firm and the public administrator. The law firm was finally advised by the public administrator "that in all probability the heirs will have no interest in the estate, due to its insolvent condition."
Mr. Bernard J. Fonseca, a member of the local bar, was the attorney who filed Peter Joseph White's opposition to the proposed private sale in November of 1948, and he related the circumstances under which the opposition was filed. His testimony is that the Consul of Ireland in New Orleans and a solicitor in Dublin, whose name was Cowan, directed him to represent Peter Joseph White "who was an heir of Robert M. White, and to take whatever steps as were necessary to protect Peter Joseph White's interest." Subsequently, the Consul requested the withdrawal of the opposition for the reason that Peter Joseph White had disposed of his interest in the succession to Nicholas D. Olivier.
The thing that stands out and impresses us most is that it undoubtedly was at the instance of someone on this side of the Atlantic that Peter Joseph White was sought out as the nephew and heir of Robert M. White. It does not appear that he had knowledge of his uncle's death in New Orleans or of the estate until the detective sought him out and he received the letter from the attorney in America.
But let us assume arguendo that Fallon's testimony regarding his having written to White is pure fabrication and that the latter's story of its receipt is a falsification, still there would remain to be answered the question of how Peter Joseph White in far-off Dublin could have learned anything of the death or of the estate.
It might be said by the public administrator that White only came forward after McGrath had advertised in the "Independent" for the next of kin of Robert M. White, but we believe the notice appeared in the newspaper long after White had been located by the detectives and the letter from America had arrived. White states that he told McGrath that he had already placed his case in the hands of the solicitor, meaning the one to whom White says he showed the letter from the American lawyer and who "did not get to carry on very far." Whoever this solicitor might be, we believe it was he who communicated with Schwabe who was instrumental in having Terriberry, Young, Rault & Carroll investigate the succession on White's behalf. This was fully two years prior to White's entrusting the matter to McGrath *535 or Mr. McCaleb's filing the petition for possession under authority of the power of attorney.
The statement of Peter Joseph White that he wrote a letter to his uncle at "Number 12 Chartres Street, Parish of Plaquemines, New Orleans," which address he claims he learned from his father who carried on a correspondence with Robert M. White, warrants some discussion. While the address is meaningless, it assumes much significance in that Robert M. White lived on Chartres Street in 1901 and at one or more times he resided in the Parish of Plaquemines. If Peter Joseph White is an imposter as the public administrator seems to think, we wonder how and why he has knowledge of Chartres Street or of the Parish of Plaquemines which were former addresses of the decedent. At the time of his death Robert M. White lived in a room at 825 Baronne Street and apparently he had resided there for quite some time. The circumstance that Peter Joseph White states that he sent the letter to "Number 12 Chartres Street, Parish of Plaquemines, New Orleans" lends much, if not full, credence to his claim to being Robert M. White's nephew.
Another feature of the case that should not be overlooked is that in 1954 and 1955 Peter Joseph White had no apparent incentive to answer the interrogatories untruthfully because he was then without any interest whatever in the succession, having disposed of all of his rights seven or eight years before without warranty. Peter Joseph White, when he gave his depositions, was an entirely disinterested witness.
We have read and reread the depositions and have sifted them and carefully analyzed their import in conjunction with the other evidence, and we are led to the conclusion that Peter Joseph White's kinship has been adequately established. It is true that our conclusion is founded on a series of circumstances, each one of which if taken by itself might possibly be explained away but when taken together constitute a cord not easily broken. The public administrator offered no affirmative evidence in rebuttal, but merely stands on his objections and resistance to the evidence offered by the claimant.
Counsel for the appellant argue strenuously that the most vital part of Fallon's testimony, that is, his statements as to what the decedent told him, as well as portions of Peter Joseph White's testimony bearing on his genealogy, is purely hearsay and as such is inadmissible in evidence.
We are well aware that the jurisprudence of this state has been consistently to the effect that statements made by a person since deceased is the rankest kind of hearsay and the weakest sort of evidence. But there is an exception to this general rule in cases which involve the question of a person's pedigree. In this type of case hearsay is admissible to prove descent and relationship, facts as to birth, marriage and death and the time when such events occurred. In Succession of Anderson, 176 La. 66, 145 So. 270, 274, the Supreme Court said:
"It is not questioned that a large part of the evidence, offered by plaintiff, touching the legitimate descent of Mrs. Delsa, is hearsay evidence. The hearsay evidence, however, consists of statements made by members of both the Schwartz and Anderson families, now deceased, relative to references to the marriage of Anderson and Miss Schwartz and to the descent of Mrs. Delsa, made prior to any controversy between the parties, or to the arising of a motive to make false statements. Hearsay evidence of this character to show family history or descent is admissible. The reason for its admissibility is the necessity of the occasion, for frequently proof cannot be made otherwise. Thus, in Jones' Commentaries on Evidence (2d Ed.) vol. 3, § 1131, it is said:
"`Pedigree is the history of family descent, which is transmitted from one generation to another by both oral *536 and written declarations and by tradition. Unless proved by hearsay evidence, not competent in general issues, it cannot in most instances be proved at all. * * *'"
And in Succession of Marcour, 180 La. 130, 156 So. 198, 203, we find this language:
"* * * But an exception to the rule against the admission of hearsay testimony has been recognized in cases involving pedigree. In such cases hearsay is admissible to prove not only descent and relationship, but also facts as to birth, marriage, and death, and the date when the events occurred. The exception to the general rule is founded on the necessity which arises from the essentially perishable nature of the probative facts and the very limited number of persons who can be assumed to have either interest in or knowledge of ancient facts of such slight general importance and of a nature at once so exact and so trival. * * *"
See, also, In re Gray's Succession, 201 La. 121, 9 So.2d 481.
The testimony of Peter Joseph White, it seems to us, establishes beyond question that his paternal grandparents and his aunts and uncles on the paternal side, as well as his parents, are all dead, having predeceased Robert M. White.
Of course, Peter Joseph White could not testify as to the marriage of his grandparents or that his father and Robert M. White were actually their children. The record reflects that the decedent was born in 1848 and the marriage of his parents, therefore, was an event that took place more than one hundred years ago, and in view of the nonexistence of vital certificates showing the fact of the marriage, no court would place the impossible burden on Peter Joseph White of making actual proof thereof. Peter Joseph White's grandparents were Robert White and Ann Kelly, who had been married but once and then to each other and had four children, two of whom were decedent and Peter Joseph White's father. These facts were transmitted to Peter Joseph White by his father and this is a subject on which he is qualified to testify under the well-established doctrine relating to the admission of proof of pedigree.
The fact is that no one save Peter Joseph White is now asserting himself to be the legal heir of the deceased, and the law is settled that where a person claiming an estate has shown he is the legal heir of its deceased proprietor, in the absence of proof that there are other heirs he will be considered as the sole heir. Samford v. Toadvine, 15 La.Ann. 170; De Gentile v. White Castle Lumber & Shingle Co., 130 La. 705, 58 So. 517.
Article XIX, § 21, of the Constitution of Louisiana of 1921, LSA, provides as follows:
"No alien who is ineligible to citizenship of the United States shall be permitted or allowed or shall have any right whatsoever to acquire by purchase, devise, inheritance, lease, assignment, gift or otherwise, or shall own or control, directly or indirectly, in his or her name, or through another interposed or by means of any corporation or association, or through ownership in his or her own name or through another of any stock or other form of security, any land or real property or any real rights or interests therein, including mortgage rights, of any kind or character whatsoever within the State of Louisiana. The Legislature may pass any additional legislation to carry the purpose of this section into effect."
These constitutional provisions are similar to those contained in the so-called alien land laws which have been enacted by several of the states and designed for the purpose of preventing persons of other races, particularly orientals, from ever acquiring land in the state. In brief appellant's counsel say this:

*537 "* * * Eligibility for citizenship of an alien is provided for in the laws of the United States, 8 U.S.C.A. § 1422 et seq. Two observations are pertinent about that law: First, the law says (8 U.S.C.A. § 1422): `The right of a person to become a naturalized citizen of the United States shall not be denied or abridged because of race or sex or because such person is married.' (Italics ours.) Second, an alien must also show, to be eligible for citizenship that he meets certain educational requirements, does not favor totalitarian form of government, is not a deserter from the armed forces, etc. Such factors as these are fundamentally more important to the Nation and State than any racial consideration.
"As the petitioner appellee has not challenged the constitutionality of such provisions, the application of the Louisiana provisions casts the burden on petitioner appellee to show compliance by proving that the heir through which it claims by mesne conveyance was eligible for United States citizenship."
We know of no law passed by Congress or any treaty entered into by the United States of America with the Republic of Eire providing that an Irish immigrant would be ineligible to acquire United States citizenship by the process of naturalization. But, be that as it may, the Congress has now extended the privilege of naturalization to persons of all races. June 27, 1952, c. 477, Title III, ch. 2, § 311, 66 Stat. 239, 8 U.S.C.A. § 1422.
If Peter Joseph White would be ineligible to become a naturalized citizen of this country because of a reason other than race or nationality, such would be an affirmative defense which must be specially pleaded and proven. No burden rested on appellee to prove a negative fact.
For the reasons hereinabove assigned, the judgment appealed from is affirmed.
Affirmed.
REGAN, Judge (dissenting).
In my opinion the proof of heirship is predicated upon "assumptions" and "presumptions" and not on fact. The sort of evidence adduced in this case could, by analogy, be used to prove the author's relationship with Adam and Eve.
I respectfully dissent.