275 So.2d 201 (1973)
STATE of Louisiana, ex rel. Frank PLAIA
v.
LOUISIANA STATE BOARD OF HEALTH.
No. 5269.
Court of Appeal of Louisiana, Fourth Circuit.
March 13, 1973.
*202 Harry A. Burglass, Metairie, for plaintiff-appellant.
James P. Screen, New Orleans, for defendant-appellee.
Before SAMUEL, GULOTTA and SCHOTT, JJ.
GULOTTA, Judge.
This is a mandamus proceeding brought by relator, a parent of Elizabeth Maria Plia[1] (five years of age) to issue a birth certificate designating thereon the child to be of the white or Caucasian, race. There does not appear to be any problem or question as to race on the paternal side of the child's ancestry. The problem lies on the mother's side. From a dismissal of her action, relator appeals.
The facts are that upon the birth of the child on March 10, 1965, in Jefferson Parish, the mother filed a certificate of live birth indicating the child to be white. Error was detected by the Registrar, and the birth registration was "flagged". No certificate was issued pursuant to regulations of July 29, 1966,[2] of the Registrar which provides that the State Registrar is authorized in behalf of the Board to investigate all errors, irregularities, or violations of the law and regulations, including all conflicts and information which he may discover or may be brought to his attention. During such investigation, according to the regulation, the Registrar shall suspend the issuance of any questionable certificate pending clarification or correction. This was done by the Registrar in this case. No birth certificate was issued because, according to the Registrar's records, there was some question as to the race of the child. This mandamus suit followed.
It is plaintiff's contention that the recent case of State ex rel. Schlumbrecht v. Louisiana State Board of Health, 231 So.2d 730 (La.App. 4th Cir. 1970), writs refused, 256 La. 69, 235 So.2d 97, decided by this court, is controlling in our case. In that case the court points out that there were inconsistencies and inaccuracies in the words "mulatto", "free persons of color", and "colored" and that such designations in the record of the Registrar are incorrectly used, and, therefore, are suspect and inaccurate. The opinion further adopts the rule that the records of the Registrar of Vital Statistics can be changed only when *203 there is "no room for doubt".[3] In the Schlumbrecht case, the factual situation is similar to ours. It is appellant's contention, therefore, that we are controlled by the holding and language in Schlumbrecht. He asserts we are compelled in this case to apply the standard of proof set out in that case. Since, according to relator, a serious doubt exists, the certificate should be issued showing the race designation "white".
On the other hand, it is the contention of the Registrar that Act 46 of 1970[4] provides when a person has more than 1/32 Negro blood, that person is black. He asserts that according to the information in his possession, this child has 5.75/32 Negro blood and accordingly, he cannot issue a certificate indicating the race designation to be white.
According to the terms of Act, in this case the Registrar can be required to issue a certificate with the classification of white unless the child can be shown to possess more than 1/32 Negro blood. Conversely, he declares that the Act by implication authorizes him to issue a certificate classifying the child as black in such cases.
The Act does not purport to provide the Registrar with any guide as to his mode of computation or as to the meaning of words in the Act and may be considered quite vague in this regard. The Registrar's problem is, therefore, two-fold. First of all, he must undertake to produce a mathematical result by using an equation consisting of many unknowns, namely, the terms used on old documents in his possession classifying the ancestors of the child as "colored," "mulatto," "French," "mixed race," "brown," which terms are uncertain insofar as they call for any specific fractions of Negro blood in the individuals so designated. The other part of the Registrar's problem is that as he tries to prove what each of these various terms means in terms of percentage of Negro blood he is operating within the stringent framework of the Schlumbrecht burden of proof.
Nevertheless, the Registrar concludes that Elizabeth Plaia has more than 1/32 Negro blood by defining a "mulatto," "free person of color," and "colored" as one who possesses ½ Negro blood. We decline to accept this premise. We fail to find authority which would allow a conclusion as suggested by the Registrar that a mulatto or colored as ½ black. A reading of the case of State v. Treadaway et al., 126 La. 300, 52 So. 500 (1910), wherein the court made an exhaustive review of the terminology relating to race, leads to a conclusion that the definition of the terms mulatto, colored, and Negro do not include any definitive or specific mathematical percentage of Negro blood in proportion to white blood.
In the instant case, were we to use the term mulatto to include ½ black, we would conclude that he possesses more than 1/32 Negro blood. On the other hand, were we to use the term mulatto to include 1/8 black, or 1/16 black, a different result would follow. In the absence of clear legislative expression and intent of the definition of the terms, we cannot supply those percentages with any degree of reliability. We agree with that part of Schlumbrecht as pointed out by plaintiff, which indicates that the race designations used are questionable.
As an example, the Registrar relies wholly on census records to determine *204 the classification of an individual[5] even though the law is settled to the effect that census exhibits are to be considered as a part of the whole picture but are not in themselves conclusive. State ex rel. Schlumbrecht v. Louisiana State Board of Health, supra; State ex rel. Francis v. Louisiana State Board of Health, 179 So.2d 681 (La. App. 4th Cir. 1965); State ex rel. Soulet v. City of New Orleans, 94 So.2d 108 (La. App.Orl.App.1957).
In the census records which are on file in this case, they show that the form provided to the person making the census allowed only five options to designate color, namely, white, black, mulatto, Chinese or Indian. When the census taker filled in that part of the form he certainly did not intend the entry of mulatto to mean that the person was half black because it would then follow that anyone who was anything less than ½ Negro would have been placed on the census record as white, a conclusion which hardly seems realistic. It would be more logical to conclude that the census taker inserted the term "mulatto" to designate anyone who did not appear all white or all black, and if the Negro blood is still traceable to the 1/16[6], it is a fair conclusion that some of those so listed on the census reports had as little as 1/16 Negro blood and certainly many did not have as much as ½ Negro blood.
Furthermore, a review of the record shows additionally the unreliability of the race designations used by the Registrar. The brothers and sisters of Lucille Grace Raphial Plaia, the mother of Elizabeth and wife of relator appear in the records of the Registrar as "French," "mulatto," and "colored". Lucille Plaia's birth is registered as mixed. The Registrar, for the purpose of his calculations, considers her to be 11.5/32 black. Lucille's father, Robert Lee Demery (Raphial), grandfather of the child is designated "white" on a death certificate while the Registrar calculates this grandparent to be ¼ black. According to his records, the mother of Robert Demery Raphial is designated "colored" and his uncles are designated "mulatto". This indicates an obvious discrepancy between the records of the Registrar and the calculations used by him. Further, the grandmother of the child, Atha Lucy Christophe, wife of Robert Demery Raphial, has no race designation, according to the records of the Registrar, and yet for the purpose of determining the race of this child, the Registrar considers that person to be 15/32 black. On the marriage certificate of Atha and Robert, both are designated "white". This presents another discrepancy because while there is no race designation for Atha Christophe, the offspring of Atha's sisters and brothers are designated in the Registrar's office "white". Therefore, the Registrar is in error when he labels Atha 15/32 black. Lucille Plaia, the mother of the child in question, Elizabeth, therefore, is the issue of white parents.
The exhibits and testimony indicate one child in a family to be white, while other exhibits indicate that child's brothers and sisters are designated as "colored" or "mulatto" or "mixed"; depending on who happened to be the person furnishing the information at the time that the child was born, be it midwife or family physician. Moreover, according to the Registrar, Clothilde Llorens, great-grandmother of the child, was considered to be ½ black while a death certificate shows her race to be "white". Furthermore, the death certificate of Louise Demery, the great-grandmother of the child, has the race designation "French" and then written above is the word "colored". Marie Julia Metoyer (great-great-grandmother of the child) is *205 considered in the Registrar's calculations to be 3/8 black while the death certificate shows her to be white. However, the census report of 1870 and 1880 designates her race as mulatto. These obvious discrepancies clearly show the unreliability of the race designation contained in the records in this case upon which the Board of Health concludes that the child herein has more than 1/32 Negro blood. But the Registrar cautions that we cannot compute the ancestry from the child backward but must compute the relationship from the common ancester forward. We fail to understand why this would result in any appreciable difference, if the records are accurate. Nevertheless, adopting the suggestion of the Registrar, we find problems which indicate the unreliability of the defendant's position. The oldest traceable branch of the family, according to the record, commences with Marie Therese, a native of Africa. The evidence submitted to show this person to be black, or a native of Africa, is a reproduction of a page of the Clarion Herald Newspaper, Volume 8, No. 17, published June 18, 1970, which discusses the history and foundation of the Metoyer family commencing with Marie Therese (a freed African slave). This evidence was improperly excluded by the trial court.[7]
However, little weight can be given to it. Reliance cannot be placed on this publication and other publications[8] without additional reliable documentation as a basis from which other race designations follow, in view of the several apparent later discrepancies in this record.
Accordingly, we cannot conclude that sufficient evidence and information is in the possession of the defendant which would cause them to refuse to issue a birth certificate to the child designating her race to be white.
Accordingly, the judgment is reversed. It is now ordered that a writ of mandamus issue commanding the Louisiana State Board of Health, through its proper officer, to issue a birth certificate to Elizabeth Maria Plaia designating thereon that the child is of the "white" race.
Reversed and rendered.
SAMUEL, Judge (concurring).
I agree the records necessarily used by the Registrar are unreliable insofar as they show, or fail to show, exact percentages of white or Negro blood, ordinarily an indispensable factor in determining whether a person has one-thirty second or less of Negro blood as required for certain race designations by LSA-R.S. 42:267 (Act 46 of 1970). As contained in those records, for example, it is quite clear "mulatto" can, and much more frequently than not does, mean a percentage of Negro blood greater or lesser than the one-half white or one-half Negro which is "mulatto" by strict definition; and obviously no particular percentage of Negro blood is indicated by the words "colored" or "mixed".[1] In this case that unreliability makes it impossible to determine whether or not the amount of Negro blood is more than one-thirty second.
Accordingly, I respectfully concur.
*206 
NOTES
[1] The record is not correctly styled. The correct spelling is "Plaia".
[2] "The State Registrar is charged with the execution of the law and all regulations of State Board of Health adopted with respect thereto and is authorized, in behalf of the Board, to investigate all errors, irregularities or violations of the law and regulations, including all conflicts in information which he may discover or which may be brought to his attention. During said investigation he shall suspend issuance of any questionable certificate pending its clarification or correction."
[3] See also: Green v. City of New Orleans, 88 So.2d 76 (La.App.Orl.App.1956); State ex rel. Francis v. Louisiana State Board of Health, 179 So.2d 681 (La.App. 4th Cir. 1965); Sunseri v. Cassagne, 191 La. 209, 185 So. 1, at page 5 (1938).
[4] Act 46 of 1970, LSA-R.S. 42:267 provides:

"In signifying race, a person having one-thirty second or less of Negro blood shall not be deemed, described or designated by any public official in the state of Louisiana as `colored,' a `mulatto,' a `black,' a `negro,' a `griffe,' an `Afro-American,' a `quadroon,' a `mestizo,' a `colored person' or a `person of color.'"
[5] Suzette Anty, great-great-great grandmother of the child in question is designated as "mulatto". The Registrar determines Suzette as ½ black.
[6] The court in Treadway, supra, made the following observation:

"The negro blood is barely traceable beyond the 1/16 and certainly not beyond the 1/32."
[7] Succession of Marcour, 180 La. 129, 156 So. 198 at p. 203 (1934).
[8] Publications entitled "Free Negro Heads of Families in the U.S. in 1830" and "Plantation Parade" were ruled inadmissible by the trial court. A proffer of these articles was made by defendant to show that Augustin Metoyer (the great-great-great-great-grandfather of the child in question and son of Marie Therese) is listed as a mulatto and is of Negro blood. Although these publications are admissible according to Succession of White, 85 So. 2d 528 (La.App. Orl.App.1956), it adds little to clarify the discrepancies.
[1] The records are understandably not concerned with such percentages due to the fact that under the prior law the only requirement for a designation of Negro race was that the Negro blood be traceable.