214 So.2d 223 (1968)
Succession of Sidney Joseph ROSSI.
No. 3150.
Court of Appeal of Louisiana, Fourth Circuit.
July 15, 1968.
Rehearing Denied October 7, 1968.
Writ Refused December 20, 1968.
*224 Zelden & Zelden, New Orleans, Max Zelden, for exceptor-administrator-appellant.
Charles E. McHale, Jr., New Orleans, for opponent-administratrix-appellee.
Before SAMUEL, HALL and JOHNSON, JJ.
SAMUEL, Judge.
Sidney Joseph Rossi died intestate at his domicile in New Orleans on December 11, 1965. Shortly thereafter his brother, Robert J. Rossi, Jr., opened the succession and was appointed administrator. As administrator he filed a petition seeking the production of succession assets allegedly held by Darlene Rossi. To that petition Darlene Rossi filed an exception of no right of action, an answer and, in effect, a reconventional demand praying that she be declared the surviving widow in community, that Robert Rossi be removed as administrator and that she be appointed administratrix. Robert Rossi filed an exception of no cause of action to Darlene Rossi's reconventional demand. The matter then was tried on the exceptions and the merits.
The trial court maintained Darlene Rossi's exception, overruled Robert Rossi's exception, recalled the appointment of Rossi as administrator, recognized Darlene Rossi as the surviving widow in community and appointed her administratrix. Robert Rossi has appealed from that judgment.
The questions presented are: (1) whether or not appellee was the legal wife of the decedent; and (2) if she was not the legal wife of the decedent, whether or not she was his putative wife.
Appellee testified as follows:
She moved to New Orleans in August, 1935 when she was 13 years of age. Two weeks after her arrival she met the decedent and shortly thereafter began living with him in open concubinage. Later she found out he owned and operated a house of prostitution. While they were living together he asked her to work for him as a prostitute, which she did, using the name of "Dolly Anderson". In September, 1936 while she and decedent were drinking in a restaurant he asked her to marry him and she agreed. That night they drove to Texas where they were married the next day by a Justice of the Peace in the presence of two witnesses. She does not recall the date of the marriage (other than it was in September, 1936) or the place of the marriage (other than it was in Texas); she remembers only that on the way back to New Orleans they passed through Beaumont and Orange. After the ceremony they continued residing together. She has never seen the marriage certificate; the decedent told her he constantly carried it in his pocket.
Between 1936 and 1938 she called herself Dolly Anderson. In 1938, when the decedent bought a motel, she discontinued working as a prostitute and became manager of the motel where they lived together. She lived with him until 1956 during which *225 period he acquired two additional motels. The entire Rossi family visited them frequently, she took care of his sick father who died at their home, raised his nephew after the boy's father died, and was referred to by all of his nieces and nephews as "Aunt Dolly".
Two years before decedent's death she began calling herself Miss Darlene Rossi and told strangers she was his niece, because he requested her to do so following a robbery at one of the motels. She stopped living with decedent in 1956 because he became involved with a younger woman; later the motel was sold; he maintained a separate residence on Canal Street and she lived elsewhere.
In support of her claim Darlene Rossi introduced the testimony of fourteen other witnesses, including her own sister, a former sister-in-law, several employees of the motel, a neighbor, a used car salesman, a niece and nephew of the decedent, a friend of the decedent also in the motel business, and a New Orleans notary. Their testimony is generally to the effect that the parties were known as man and wife and accepted as such in the community. We deem it necessary to mention in more detail the testimony of one of the employees, who was a bookkeeper, and the notary.
The bookkeeper was employed by the decedent in 1940. Thereafter, until Rossi's death in 1965, he kept the motel books, prepared and filed the tax returns and saw the decedent and Darlene Rossi several times each month. When Rossi first introduced this witness to Darlene he referred to her as his wife. Darlene Rossi practically ran the business, most of the bills were sent to her as Mrs. Sidney Rossi, the two lived together at the motel, and they had joint checking accounts. However, on cross examination the witness admitted Rossi always filed separate income tax returns. He questioned the decedent about this, pointing out the tax disadvantages, but Rossi would not agree to file anything but a separate return, reporting himself as single.
The notary testified he handled and act of sale by which a tourist court belonging to one of his clients was purchased by Rossi on August 4, 1960. Rossi's attorney, now deceased, contacted him prior to the passage of the sale with the request that the marital status be deleted from the act. On the date the act was to be passed Rossi and his attorney arrived at the notary's office before the vendors. At that time he talked to Rossi, insisting on knowing his marital status. Rossi told him he had been married around Beaumont by some Justice of the Peace, he had a marriage certificate, which he could not find, but his married status could not be revealed because he was having serious trouble with the Department of Internal Revenue and did not want to get his wife involved. At Rossi's insistence the act was passed with the marital designation showing he had never married.
Mrs. Therese Canton, a witness offered by Robert Rossi, testified she considered herself married to the decedent from 1935 to 1951. She had known him as a child and began to live with him in 1933 when she was 17 years old. After a drinking party two years later he led her to believe they were married, stating he had a marriage license or papers. She does not remember marrying him and never saw a license or a certificate, although she asked him for the marriage certificate on numerous occasions. In 1951 she left him because he would not produce the certificate. Except for the time he was in the army, during the period of their association he would come home for supper every evening about 5 or 6 p. m. and leave between 10 and 11 p. m. to return to his motel business. In 1961 she married Canton. She did not divorce the decedent, thinking it unnecessary to do so because she then considered her relationship with Rossi had been only a common law association.
It is undisputed that the decedent entered into various notarial acts involving immovable property in which he described himself as having never been married and the record contains no evidence that he ever *226 entered into a notarial act or any other legal document in which he is described as having been married; he always filed separate income tax returns describing himself as single; for several years prior to his death appellee described herself as his niece; at his death she informed the funeral home the decedent had never married and she was his niece; and she signed his death certificate stating he had never married.
In support of her contention that she is the legal wife of the decedent, appellee relies on our settled jurisprudence that a presumption of marriage arises from cohabitation and a general reputation that the parties are man and wife. However, in order for the presumption to arise, from its beginning the relationship must have the appearance and general reputation of marriage; if the relationship began in open concubinage, the presumption does not arise and the litigant seeking to prove the marriage must bear the burden of showing that some change took place in the relationship which converted the illicit union into a marriage valid under the laws of this state. Succession of Theriot, La.App., 185 So.2d 361 and cases cited therein.
In the instant case it is quite clear, and appellee admits, that her cohabitation with the decedent began in concubinage in August or September, 1935 and they lived together in that relationship until the alleged marriage in September, 1936. Appellee therefore has deprived herself of the benefit of the presumption; she must bear the burden of proving the valid marriage which she alleges took place in Texas in September, 1936.
She has failed to discharge that burden. The only direct evidence of a marriage ceremony is her own testimony. Not only is there a complete lack of documentary evidence to support her contention that she was legally married, she appears to have made very little, if any, effort to obtain such evidence. Her testimony on this point is as follows:
"Q. Have you since this litigation was initiated, prior to this litigation or at any time since you were married to Sidney, written in an attempt to find out exactly where you were married?
A. Yes, I tried to find out.
Q. Do you have copies of those letters?
A. I have a letter that came back with a check that was mailed, I think it was sent toI'm not sure, Austin, Texas maybe, the capitol, because I thought maybe that's where it should have been recorded.
Q. You have a copy of that check and that letter that you sent?
A. I have it home.
Q. You don't have it here in court?
A. No, in fact, a friend of mine tried to get it for me then, they went to different counties and they sent me a list
Q. Have you yourself ever made any attempt to contact the individual counties to determine exactly where you were married, Mrs. Rossi?
A. No, I haven't.
Q. Have you with any degree of certainty ever ascertained from Sidney or anybody else exactly the date of your marriage?
A. No, I knew it was in September, 1936, but I don't know what date."
It is significant that the check and the letter allegedly sent by appellee to Austin, Texas, were not produced in evidence.
Appellee can gain little or no support from the testimony of the decedent's bookkeeper and the notary insofar as that testimony tends to show the decedent told them he was married to the appellee. For we note the decedent was very careful not to admit or claim the marriage in any legal document as a result of which he might *227 suffer some prosecution. This is particularly true of his income tax returns. Obviously, the taxes paid by him as a single person were higher than they would been if he had filed as a married person. But, if he and the appellee were in fact not married and he filed returns claiming they were, he would have run a grave risk of criminal prosecution. That he was in fact not married appears to us to be the most likely reason he filed income tax returns as a single person. In addition, the testimony of Mrs. Canton, for whatever that testimony otherwise may be worth, together with the decedent's manner of living, indicates to us how he looked upon marriage and the consequent unlikelihood of his entering into that contract. We conclude that the appellee has failed to prove she was the legal wife of the decedent.
We also are of the opinion that appellee was not the putative wife of the decedent. The pertinent articles on putative marriage read as follows:
"The marriage, which has been declared null, produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith." LSA-C.C. Art. 117.
"If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor, and in favor of the children born of the marriage." LSA-C.C. Art. 118.
It appears obvious to us that there can be no putative marriage in the absence of a marriage actually contracted but illegal or null for some reason unrelated to the consent or the ceremony. The quoted Civil Code Article 117 makes this clear in providing "The marriage, which has been declared null, * * *, if it [the marriage] has been contracted in good faith". See Succession of Cusimano, 173 La. 539, 138 So. 95; and see the concurring opinion of Chief Justice O'Niell in Succession of Dotson, 202 La. 77, 11 So.2d 488.
According to Planiol there must be some kind of ceremony in order for a putative marriage to exist. Planiol Traite Elementaire De Droit Civil, Vol. 1, Part 1, § 1107.
Appellee relies on Succession of Marinoni, 183 La. 776, 164 So. 797, in which a young foreign girl was taken by an older man to Mississippi to be married. The offspring of the alleged marriage introduced in evidence two affidavits signed by her deceased father preparatory to his obtaining a marriage license. It was undisputed that a marriage license was actually obtained and the girl was told this was the only formality necessary except for the blessing by a priest. The court held that a putative marriage did in fact exist.
We do not agree with this holding for the reasons just stated. But, of course, if the facts in the instant case were identical with those of Succession of Marinoni, we would follow that decision. However, we find that Marinoni is distinguishable from the instant case because there some documents relating to the marriage were introduced and some formalities obviously were observed. In the instant case, no documentary proof of marriage was introduced nor, with the sole exception of the testimony given by Darlene Rossi herself, is there any competent or credible evidence that the alleged marriage was contracted or that any formalities were observed.
For the reasons assigned, the judgment appealed from is avoided, annulled and reversed and it is now ordered that there be judgment in favor of the appellant, Robert J. Rossi, Jr., and against the appellee, Darlene Rossi, dismissing the latter's demands; all costs to be paid by the appellee, Darlene Rossi.
It is further ordered that this matter be remanded to the trial court to be proceeded with in due course in accordance with law and the views herein expressed.
Reversed and remanded.