325 So.2d 296 (1975)
Succession of Joseph Isom FUSELIER.
No. 5133.
Court of Appeal of Louisiana, Third Circuit.
December 24, 1975.
Rehearings Denied January 28, 1976.
Writs Refused March 9, 19, 1976.
*298 Edwin A. Stoutz, Jr. and Robert R. Gisevius, New Orleans, for plaintiff-appellant.
Tate & Tate by Donald J. Tate, Donald Soileau, Mamou, for defendant-appellee.
Before HOOD, MILLER, DOMENGEAUX, WATSON and BEER, JJ.
BEER, Judge.
Joseph Isom Fuselier, died on February 2, 1973, at Savoy Memorial Hospital in Mamou, Louisiana. While hospitalized he executed a last will and testament in statutory form dated January 30, 1973. In that will he recognized Linda Marie Fuselier (Mrs. Andre Sharp), as his daughter and bequeathed her one-half of the residue of his estate.[1] The other half was bequeathed to decedent's son Joseph Donald Fuselier who, through his curatrix, Evangeline Ledoux Manuel, challenges the decedent's testamentary capacity and further contends that Linda Marie Fuselier was not the natural child of the decedent, or, alternatively, that she was his illegitimate daughter.
The executrix, Grace McGee Fuselier, tacitly joins in the contention that Linda Marie Fuselier is the illegitimate daughter of Joseph Isom Fuselier by alleging that she "verily believes that the dispositions in favor of Linda Marie Fuselier are invalid as a legacy under Article 1483[2] of the Louisiana Civil Code and invalid as an alimentary allowance under the same article, considering the age and station in life of the purported legatee."
After trial of these issues, the district court concluded that Joseph Isom Fuselier had testamentary capacity and determined that Linda Marie Fuselier was the illegitimate child of Joseph Isom Fuselier, holding that Daisy Davis (Fuselier), mother of Linda, was not legally married to Joseph Isom Fuselier at the time of the birth of their daughter. The district court further determined that an alleged putative marriage had not taken place between decedent and Daisy Davis (Fuselier) and thus concluded that Daisy Davis (Fuselier) could not be a good faith partner to a putative marriage. From this judgment Linda Marie Fuselier (Mrs. Andre Sharp) has appealed.
The record does not support the contention that Joseph Isom Fuselier lacked testamentary capacity at the time his will was executed. It is apparent that he was seriously ill and that his physical capabilities were depleted and diminished. It is also apparent that he was receiving *299 medication and doubtlessly was in some was affected thereby. However, many wills are written under just these circumstances and there has been no affirmative showing that should cause us (or the trial court) to reach even the threshold of doubt as to his testamentary capacity when his will was made. Agreeing fully with the trial court's conclusion on this issue and finding nothing in the evidence upon which to seriously base a contrary finding, we move on to a consideration of the legitimacy of Linda Marie Fuselier and her capacity to come to her father's succession.
The record clearly supports the positive conclusion that Linda Marie Fuselier is the daughter of decedent and Daisy Davis (Fuselier). The record further supports the factual finding by the trial court that "decedent [Joseph Isom Fuselier] informally acknowledged her [Linda] in actions and conduct, loved her very much, wanted to help her while living and provide for her after his death. . . ." Indeed, this brief description of the relationship between decedent and his daughter is certainly as clear as any we might attempt to phrase after our painstaking review of the extensive record.
The record also fully supports the trial court's finding that Linda's mother, Daisy Davis (Fuselier), initiated a change in the records of her employment with the Telephone Company back in March of 1945 within days after her alleged marriage to decedent. The change was in her marital statusfrom "single" to "married."
Equally important, in our view, is the factual finding by the trial court, also entirely supported by the record, that Joseph Isom Fuselier was identified as Linda's father (without mention of illegitimacy) on the records of the hospital where she was born and on her birth certificate.
The record further contains unchallenged testimony, from witnesses called by the executrix that decedent had, on various occasions and in various ways, made known his father-daughter relationship to Linda. Burke Pierrottie, who as Isom's "very good friend" described the time that Isom "made a crack" about him [Mr. Pierrottie] being a grandfather and then told him of his daughter Linda and her children, pointing out that he, too, was a proud grandfather. Mr. Pierrottie affirmatively testifies that Isom never restricted him in any way from discussing his acknowledgement of fatherhood, did not appear in any way to be ashamed of the fact and, from this, Mr. Pierrottie made the "natural assumption" that Linda was Isom's legitimate child.
The record also contains unchallenged testimony of Linda which confirms that:
(1) She has always believed that she is the legitimate child of decedent;
(2) She has never had reason to doubt the correctness of her birth certificate;
(3) She was always registered at school as Linda Marie Fuselier;
(4) She was never known by any other name until her marriage;
(5) She had a continuing, comfortable, happy relationship with her father, Isom;
(6) She was partially supported by her father during her college career (supplementing a partial scholarship);
(7) She received mail from Isom signed, "Love, Dad";
(8) She stayed at "her father's house" when she attended his funeral in Mamou.
Pretrial discovery procedures had largely disclosed most of these contentions and refutation could certainly have been easily accomplished by able counsel if, indeed, such was possible.
Thus, we take note of the fact that the record supports a prima facie showing of the legitimacy of Linda Marie Fuselier without the necessity of making reference to any contested factual issues *300 and we further note that the presumption of legitimacy is a principle of Louisiana law which applies with particular force in favor of the child asserting it. In re Gray's Succession, 201 La. 121, 9 So.2d 481 (1942); Succession of Kneipp, 172 La. 411, 134 So. 376 (1931); Succession of Gaines, 227 La. 318, 79 So.2d 322 (1955).
In Succession of Curtis, 161 La. 1045, 109 So. 832 (1926), where the legitimacy of a child was at issue, the Supreme Court stated:
"`A child is presumed to be legitimate until the contrary is shown.' 7 C.J. 940. The presumption of legitimacy is based upon broad principles of natural justice and the supposed virtue of the mother.
"`The presumption in favor of marriage and the legitimacy of children is one of the strongest known to the law, and in favor of a child asserting its legitimacy this presumption applies with peculiar force.'"
Essentially the same prima facie showing is evident from the record insofar as the alleged putative marriage is concerned. It is most unlikely that Daisy Davis (Fuselier) would have been able to detect her own pregnancy somewhat more than nine months prior to the birth of Linda. Hence, there was little reason for her to change her employment records at that time except to reflect the fact that she had good reason to believe she was married. It is certainly reasonable to conclude that the change was made because of the pride and excitement of her marriage and her desire that her employer and fellow employees know about it.
Just as with legitimacy, the law regarding putative marriages presumes good faith on the part of the parties to it and the burden of proof rests on the opponent to prove bad faith. Succession of Navarro, 24 La.Ann. 298 (1872); Howard v. Ingle, 180 So. 248 (La.App. 2nd Cir. 1938); Melancon v. Sonnier, 157 So.2d 577 (La. App. 3rd Cir. 1963). While affirmative evidence was introduced to show that Daisy Davis (Fuselier) had acted in good faith, no acceptable evidence was introduced to show that she acted in bad faith, notwithstanding the trial court's doubts about the exact facts of the alleged marriage.
Louisiana law provides that civil effects flow to those who contracted a marriage in good faith and also to the children if both or only one of the parties contracted the marriage in good faith.
"The child of a marriage contracted in good faith by at least one of the parties thereto is legitimate as to both. LSA-C.C. Arts. 117, 118. The burden of proving bad faith on the part of those contracting the putative marriage is upon the party contending that such was entered into in bad faith." Melancon, supra.
We find that the record supports the conclusionas a matter of lawthat a prima facie showing has been made of:
(1) The legitimacy of Linda Marie Fuselier; and
(2) The putative marriage between Joseph Isom Fuselier, father of Linds, and Daisy Davis (Fuselier), mother of Linda.
After having carefully and conscientiously overseen the compiling of the record regarding these issues, the able district court apparently fell into an error which is best evidenced by its own observations to the effect that it (the court) felt obliged to "strain[ed] to permit the daughter [Linda Marie Fuselier] to . . . prove [her] legitimacy . . . ."
In short, the trial court mixed up the presumptions that should have been applied. Once the prima facie showing of legitimacy was established, as it clearly and emphatically was in several well recognized *301 ways,[3] the burden of proof shifted to those attacking the legitimacy of Linda Marie Fuselier and it became necessary for them to prove, by a preponderance of admissible evidence (not innuendo or suggestion or observations of counsel),[4] that Linda Marie Fuselier was, indeed, illegitimate.
We take note of the fact that although Louisiana's strong presumption of legitimacy properly stems from long-established moral considerations, it is peculiarly emphatic in this State because of the overriding possibility of a harsh and unjust result from just such application of Louisiana Civil Code Article 1483 as has been done here. The awesome possibility that a legitimate child could, without that strong presumption of legitimacy in his favor, find himself barred from coming to the succession of his own parent is so morally, socially and ethically revolting as to require that such presumption, in civil succession matters, be as ingrained and as fundamental as the presumption of innocence in criminal matters. Only by such presumption can the law do its full duty to protect a Louisiana child's acknowledged basic right to inherit from its parent. We can think of no civil law result more unsatisfactory or more contrary to bedrock moral principles than one which could relentlessly deprive a child of the right to inherit from its parent by the imposition of a stringent requirement that he affirmatively carry the burden of proving his legitimacy. Indeed, such a requirement would, we believe, be as untenable to the legal principles of our State as would be the continued incarceration of an innocent man until he affirmatively carries the burden of proving his innocence.
Based upon this, and acting in response to the clear call of our Civil Code and the general body of our law to be ever zealous in guarding the inheritance rights of children, our courts have, properly, protected and vigorously defended the presumption of legitimacy.
Thus, while Louisiana has steadfastly maintained its Civil Code-based right to bar illegitimate children from succession rights in certain particularized circumstances[5], its judicial system has clearly *302 done its effective best to guard against the possibility of a grave injustice by recognizing, in the strongest terms, the presumption of legitimacy.
As we carefully review the record in our search to determine if it supports a finding that those who attack the legitimacy of Linda Marie Fuselier have carried their burden of proof, we conclude that it does not. The contrary is, in fact, the case. Thus, we are unable to agree with that portion of the judgment which deprives Linda Marie Fuselier of the bequest in her favor of one-half of the remainder of her father's estate.
Accordingly, it is ordered, adjudged and decreed that the judgment of the Thirteenth Judicial District Court for the Parish of Evangeline dated October 21, 1974 be amended to hold that Linda Marie Fuselier is the legitimate child of Joseph Isom Fuselier and has the capacity necessary to receive, and shall receive, the property of her father, Joseph Isom Fuselier, under and in accordance with the terms of his testament dated January 30, 1973; and
Thus amended, the judgment, which is correct in all other respects, is affirmed.
Cost of this appeal to be borne jointly by appellees.
Amended and affirmed.
DOMENGEAUX, J., dissents and assigns written reasons.
DOMENGEAUX, Judge (dissenting).
Regretfully finding the majority opinion of my learned brothers seriously lacking in analysis of the factual and legal issues pertinent to this litigation, I am compelled to dissent.
Joseph Isom Fuselier, the decedent, left a will bequeathing certain portions of his estate to his spouse, Grace McGee Fuselier. The remainder of his estate was bequeathed to his two children, Donald Fuselier and Linda Marie Fuselier, with contingency provisions should the bequests to the latter fail.[1]
The major issue with which this appeal is concerned is the legitimacy of Linda Marie Fuselier and her capacity to inherit from her biological father, the decedent, in accordance with the aforementioned will.
The record reveals that the decedent was married November 7, 1925, to one Evangeline Ledoux, from which union Donald Fuselier was the legitimate issue. Decedent was divorced from his first wife May 12, 1941. In 1945, in the city of New Orleans, he entered into a relationship with one Daisy Davis, the mother of Linda Marie Fuselier. This relationship terminated some time in April of 1945. Linda Marie Fuselier was born in the city of New Orleans on December 27, 1945. Her birth certificate lists her father as Joseph Isom Fuselier, but it was unsigned by the decedent. Daisy Davis' records at her place of employment, the telephone company, were changed to show that she was married and that her new name was Daisy Davis Fuselier. This personnel record from the telephone company was introduced at trial, and while the name change was typewritten on the document, there was, handwritten in red ink, the date "3-24-45" above the name of Daisy Davis "Fuselier".
The filiation between the decedent and Linda Marie Fuselier has never been seriously questioned. After Linda's mother, Daisy, married her present husband, Mr. Ullrich, in 1952, and moved to Covington, Louisiana, the decedent visited with his *303 daughter several times. He wrote her a number of letters, always indicating that he considered her to be his daughter. In addition, the decedent afforded Linda some financial assistance during her abbreviated college career.
Since Civil Code Article 1483 prohibits donations to natural or illegitimate children in the event the testator leaves other legitimate children or descendants,[2] Linda may only enjoy her legacy if in fact she is a legitimate descendant of Joseph Isom Fuselier.

LEGAL OR PRESUMPTIVE MARRIAGE AND PRESUMPTIONS OF LEGITIMACY
I agree with the majority that the incapacity of an heir is never presumed and that he who alleges it must prove it. Civil Code Article 952.[3] However, I do not believe the converse is true. While one who asserts the incapacity of an heir to inherit must prove that charge, I do not feel that there is a strong presumption of capacity to inherit.
The majority feels that:
" . . . the record supports a prima facie showing of the legitimacy of Linda Marie Fuselier without the necessity of making reference to any contested factual issues and we further note that the presumption of the legitimacy is the principle of Louisiana law which applies with particular force in favor of the child asserting it."
I am totally unable to discover any prima facie showing of Linda Marie Fuselier's legitimacy. I feel that the majority has erroneously applied the presumption of legitimacy to a situation in which it is not applicable. Civil Code Articles 184 through 197 deal with legitimate children. This chapter is divided into two sections. Section 1 consists of Articles 184 through 192, and is entitled "Of Legitimacy Resulting From Marriage". Article 184 states the basic principle of this section:
"The law considers the husband of the mother as the father of all children conceived during the marriage." (Emphasis added).
Section 2 of the chapter dealing with legitimate children is entitled "Of the Manner of Proving Legitimate Filiation", and is comprised of Articles 193 through 197.
Section 1 of the chapter presupposes a marriage between the parents of the child. Without a marriage no presumptions arise as to legitimacy of a child although his direct filiation can be easily proven. I feel that this principle is so elementary as to warrant little further discussion.
Section 2 of the chapter provides several methods by which a child may prove legitimate filiation, including a showing in the registry of birth or baptism (Article 193), constant reputation as a child born during marriage (Article 194), general reputation and acknowledgment as a child of a particular family (Article 195), or other written or oral evidence (Article 196). I believe that a logical interpretation of these codal provisions leads one to find that they also are intended to apply to situations in which there has been a marriage between the parents of the child asserting his rights under the Articles. This section of the Civil Code is apparently more concerned with filiation than with legitimacy. I fail to see *304 how the registry of birth can be conclusive proof of legitimacy, absent a showing of a marriage between the parents. As the court stated in Succession of Hubee, 20 La.Ann. 97 (1868):
"The register of births was competent evidence to prove one of the elements of legitimacyfiliation, but not the legitimacy of filiation, even, although the declaration of the legitimacy of the child be made thereon by his father."
In my opinion the conclusion is inescapable that before any presumption of legitimacy arises there must be first a showing of a marriage or such condition that will give rise to the presumption of a marriage. As the court stated in Boykin v. Jenkins, 174 La. 335, 140 So. 495 (1932):
"It is only those children who are born in or as a result of wedlock, or who are legitimated by their father and mother in the manner prescribed by law, who may be termed lawful or legitimate heirs of their parents.
But proof of the celebration of a marriage between parents is not indispensable to the children's right to inherit from them, for such proof cannot always be made. In the absence of such proof, however, they must show that they were born of parents who were so living together and to conducting themselves toward each other in society, holding themselves out as man and wife, as to raise the presumption that they were married. When the facts shown are such as to raise the presumption of marriage, the further presumption that their children are legitimate necessarily follows. (Emphasis added).
A presumption of legitimacy arises also from proof of legitimate filiation."
But, as has been discussed above, the proof of legitimate filiation presupposes an already existing marriage or at least a factual situation sufficient to form the basis for a presumption of marriage.
To briefly state my position at this point, I feel that in order for any presumption of legitimacy to arise based upon Civil Code Articles 184 through 197, there must first be either the showing of a marriage between the parents of the child or sufficient facts to give rise to a presumption of marriage between those parents.
See Succession of Anderson, 176 La. 66, 145 So. 270 (1932), in which the court said:
" . . . the evidence offered by Mrs. Delsa to prove the marriage of Anderson and Emma Schwartz by general reputation was admissible. Such being the case, we think it clear that the evidence adduced fully justifies the presumption of marriage, and therefore the presumption of the legitimacy of Mrs. Delsa to which presumptive marriage she traces."
See also Succession of Jacobsen, 182 La. 151, 161 So. 185 (1935), where the court stated:
" . . . There is nothing in the record to show that the father of decedent and his mother ever lived together as man and wife or even held themselves out as husband and wife. In the absence of such evidence, there cannot be a presumption of a marriage which is necessary to raise the presumption of the legitimacy of decedent.
There is no competent evidence in the record to establish a marriage between Fanny Jacobsen and the father of decedent. Therefore, there is no presumption of legitimacy of Tony Jacobsen." (Emphasis added).
Thus it appears that the legitimacy and presumptions thereof of Linda Marie Fuselier are dependent upon the existence of a marriage between her mother and the decedent. *305 If no marriage or facts to justify a presumption of marriage are shown then there should be no presumption of legitimacy on behalf of Linda Marie Fuselier.
I do not believe that there was ever any serious contention in this case that a valid legal marriage actually existed between Daisy Davis and Joseph Isom Fuselier. No attempt was made to introduce any marriage license or certificate not were the witnesses and celebrant produced or identified. However, even absent such proof, a marriage can be shown. As the court stated in Cameron v. Rowland, 208 La. 663, 23 So.2d 283 (1945):
"No record or documentary evidence of a marriage was produced and no one testified to having witnessed one. But, over defendant's objection, evidence aliunde was admitted on the authority of the cases cited below and the jurisprudence established by them, and others, that marriage, like other contracts, may be proved by any species of evidence not prohibited by law which does not presuppose a higher species of evidence within the power of the party." (Citations omitted).
This evidentiary rule was limited, however, in Cameron, as follows:
"As was said by the Court in the case of Succession of Hubee, 20 Ann. [La.Ann.] 97, the rule has special application where petitioner is not a spouse seeking to prove a marriage, in which he or she was a party and who would be presumed to know all the facts and circumstances attending such marriage, but a child who has not and cannot be supposed to have, in regard to the marriage of his deceased parents, the same means of information."
Thus, under certain conditions and showings, a presumption will arise as to marriage, and the marriage being established, a subsequent presumption of legitimacy will issue therefrom. See Blasini v. Succession of Blasini, 30 La.Ann. 1388 (1878), wherein the court stated:
" . . . From certain established facts certain legal presumptions are deduced; and where it is proven, as in this case, that the parties from the time of their first appearing together in the community in which they made their permanent domicile, publicly cohabited, assuming to be husband and wife, without separation or interruption until death intervened: that the woman bore the man's name, and he called her his wife, and introduced her as his wife, and declared that he had married her in the land of her birth: where they present their offspring to the world as their children, give them the surname of the father, have them baptized as their children, and rear, and care for, and educate them as such, the law accords to the man and the woman and to their children a legal and social status, based upon the presumption of marriage, the consequence of which is the presumption of legitimate filiation and descent, which imposes on those who assert the contrary the burden of destroying that presumption." (Emphasis added).
For the proposition that a presumption of legitimacy applies in this case, the majority cite In re Gray's Succession, 201 La. 121, 9 So.2d 481 (1942); Succession of Kneipp, 172 La. 411, 134 So. 376 (1931); Succession of Gaines, 227 La. 318, 79 So.2d 322 (1955); and Succession of Curtis, 161 La. 1045, 109 So. 832 (1926). A mere perusal of the above jurisprudence shows that in each of those cases the "husband and wife" lived together, raised a family, and held themselves out to members of the community to be validly married individuals raising legitimate children. Reference to Blasini, supra, and the previously quoted language from Boykin v. Jenkins, supra, clearly indicates that the presumption of marriage is not automatic. Rather, the parties claiming the marriage or rights *306 therefrom must at least establish the basic facts required by the two above cited cases.
Even a complete acceptance of the testimony of Daisy Davis Ullrich leads one to find that she and Joseph Isom Fuselier never established a permanent domicile, cohabited publicly, introduced each other as spouses to friends and family, nor did they ever conduct themselves in the general manner which one would expect of married persons. Not a single witness was produced to testify as to ever having met or known Daisy and Isom as man and wife, and no evidence was introduced as to their enjoying a general reputation of marriage. While Isom clearly admitted that Linda was his daughter, he never declared to anyone that he had been married to Linda's mother.
I agree with my brothers of the majority that once the presumption of marriage is established, with it arises the presumption of legitimacy which is very difficult to overcome. However, I must reiterate that this presumption of marriage is not automatically accorded to any party who would rely upon it. Rather, there must be some basic factual display in order to activate the operation of the presumption. Considering the facts of this case, I feel that Linda Marie Fuselier has failed to show that her parents were either validly legally married or that they conducted themselves in such a fashion as to raise the presumption that they were married, and therefore there should be no presumption of her legitimate relation to the decedent.

PUTATIVE MARRIAGE
The majority also find that the record supports the conclusion that a prima facie showing has been made that a putative marriage existed between Joseph Isom Fuselier and Daisy Davis. I am unable to agree with this contention of my learned brothers.
A putative marriage is founded on the reasonable belief by at least one of the parties that they are honestly married and that their offspring are the result of a lawful and honorable union. Succession of Marinoni, 183 La. 776, 164 So. 797 (1936).
However, to claim a "putative" marriage, there must be a showing of some type of ceremony or celebration by which the parties intended to enter into the marriage contract. Succession of Marinoni held that since Civil Code Articles 117 and 118 dealing with putative marriage are literal translations of Code Napoleon Articles 201 and 202, views of the French commentators are applicable to our companion Articles. In reference to the putative marriage Plainol states at Volume I, Part 1, No. 1107:
"It is nevertheless necessary that there have been some kind of celebration. According to the text, it is the marriage `contracted' in good faith that produces its civil effects. It is therefore necessary that there have been at least something that may be considered to be the celebration of marriage . . . The courts should therefore certainly refuse to accord civil effects to the marriage of any one who would claim to be married without any act . . ."
In the case of Succession of Cusimano, 173 La. 539, 138 So. 95 (1931), rehearing denied, the parties obtained a marriage license but there was no proof that a ceremony was ever performed. The court stated:
" . . . As there was an entire lack of any such celebration in this case, there was no marriage contracted between Mrs. Di Gratta and Nicolo Cusimano.
As there was no marriage contracted by Mrs. Di Gratta and Cusimano, even a void one, the status that existed between them cannot be deemed that of a putative marriage, possessing the effect, even as to Mrs. Di Gratta (though it is possible she may have been in good faith), of *307 a valid marriage, for it is only to the marriage actually contracted, though null, that the law, where it was contracted in good faith, attaches to it the civil effects of a valid marriage. Civ.Code, arts. 117, 118."
The occurrence of a marriage ceremony is a factual matter. Again, I feel that the majority has misapplied what they term to be a "presumption" to the existence of a putative marriage. Of the three cases cited by the majority in support of a presumption of a putative marriage, two of them involve situations in which there was a clear showing of a celebration or ceremony.[4] The third case does not truly deal with putative marriage but more with the aforementioned presumption of marriage resulting from years of co-habitation and reputation.[5]
In his reasons for judgment the trial judge was most emphatic in his finding that no putative marriage existed between Daisy and Isom. The District Judge stated:
"The Court did not believe the testimony of Daisy Davis, because:
a. Her story of her marriage is incredible. (Emphasis added). She says she was living in New Orleans, employed as a telephone operator, and got a telephone call from Isom Fuselier in the morning that he was coming with a license to marry her that day,all the way from Mamou to New Orleans in a car. That he drove from Mamou to New Orleans, picked her up, took her to Eunice, again by car, the same day, and, after the ceremony, took her, the same day, back to New Orleans for the wedding night. The demeanor of the witness on the stand, her education, her experiences in life, her age of 26 at the time of the alleged marriage, her employment as a telephone operator at the time of the claimed marriage, and her maturity then, all gainsay her story . . . . The Court feels, from her testimony, that her story was fabricated to help her illegitimate daughter.
b. Her story of her divorce from Isom Fuselier is about as incredible. She says Isom Fuselier told her he got a Mexican divorce from her in Mamou. This, sometime before 1952 (when she married Mr. Ulhrich [sic] occurred when she was even more mature and experienced than when she claimed she was married to Isom Fuselier. Such a story should have made her suspicious, with her experience and maturity. Yet she showed no concern about whether she was divorced or not, made no further inquiry, and went ahead and married Mr. Ulhrich [sic]. Her father was suspicious about her marriage and apparently tried to check it out through an attorney. He must have been satisfied she was not married to Isom Fuselier, as he raised no protest to her second marriage, and made no search for a divorce, etc.. . . .
. . . . All of the indicia of legitimate, or even putative marriage, are missing.
The strongest argument of the daughter and the mother is that the employment card of the mother with the telephone company was changed from single to married on 3/24/45. The method of the notation is doubtful, but the really salient factor is that her status was changed from single to married to protect her employment, as the employment practice at this time was to fire pregnant, unmarried women."
Obviously the trial judge found Daisy Davis' testimony concerning the marriage and subsequent events very difficult to accept. Daisy testified that Isom picked her *308 up in New Orleans, drove to Eunice, Louisiana, where the ceremony was performed, then took her back to New Orleans for the honeymoon. I take judicial notice of the fact such a journey entails a round trip of over 400 miles in a relatively short period of time in the year of 1945 in which automobile travel was much less advanced than it is today. In addition, Daisy could not furnish the name of the celebrant or any witnesses, and she showed a remarkable lack of concern regarding her marital status to Isom when she entered into a marriage with her present husband. I also find it odd that her current spouse, Mr. Ullrich, was under the impression for some time that Daisy was originally married to Isom somewhere in Mississippi. Also of considerable interest is a letter written by Daisy to the attorneys for the physician who delivered Linda. In response to a collection inquiry by the attorneys for the medical services rendered in the delivery and related care, Daisy wrote on February 8, 1947:
"Dear Sirs:
Several months I received mail from Dr. Wohl for Mr. Joseph Fuselier and I forwarded it to Mr. Fuselier at Mamou, Louisiana. Now I received a notice from your office for Mrs. Joseph Fuselier for immediate collection for the sum of $50.00.
May I make it clear that I am not responsible for that bill as Mr. Fuselier is to settle all bills of that kind as he agreed to.
Apparently Mr. Fuselier is out for getting by without paying his bills and take advantage of someone else. Accordingly to his attitude he has shown toward his child he is that type of person or character. He has never sent or gave me a nickel to get food or clothing for the baby . . . .
Hoping you will contact Mr. Fuselier and consult the matter over with him. . . ."
The letter is signed "Daisy Davis". It contains a handwritten postscript which reads in part:
"Here is more information may be of importance concerning Mr. Fuselier. . ."
This communication, in light of the other above recited facts pertinent to this litigation creates a serious doubt in my mind that Daisy Davis ever entered into a marriage contract with the decedent. Nowhere in the letter does Daisy refer to herself as "Mrs. Isom Fuselier" nor does she refer to the decedent as her husband, but only calls him "Mr. Fuselier" and describes him as an individual who would take advantage of people. It is significant that she signed the letter "Daisy Davis" and not "Daisy Fuselier". Indeed the overall tenor of the letter is not that of one written by a wife about her husband. It is evident that the trial judge took cognizance of all these facts relevant to Daisy's claim of a good faith putative marriage.
The only facts which support a claim of Daisy's marriage to Isom are the change in Daisy's personnel records with the telephone company, the listing of Isom as Linda's father on the birth certificate, and the use of the name "Fuselier" by Daisy and Linda. Obviously, the creation of these conditions was within Daisy's province exclusively.
To be content with the majority opinion one will have to accept the fact that henceforth a woman may bear a child after a brief union with a man, give that child the father's name, and list the father on the child's birth certificate. Upon the father's death more than a quarter of a century later, the child may then present himself at his father's succession, allege the occurrence of a "marriage ceremony" between his parents, invoke this multitude of "presumptions" and have himself declared a legitimate heir by an appellate court, in total disregard of the factual findings of the *309 District Judge. The majority's approach requires the other heirs of the decedent to, in effect, prove a negative, that is, that the child's mother and the decedent were never in fact married. This non-marriage can be exceedingly difficult to prove, especially when the only rebutting witness is the decedent. For in the instant litigation Daisy did not produce a single individual who claimed to know of the marriage or of the marital relationship allegedly existing between herself and Isom.
As indicated in Cameron, supra, the relaxation of the degree of proof required to show a marriage is particularly applicable in situations where a child seeks to prove the legitimacy of the relationship which existed between his deceased parents. However, in cases such as the one at bar, where a parent is alive and able to testify, the requirements of showing specifics about the marriage are more stringent.
Isom's only clear statement about his relationship with Linda, his acknowledged daughter, is found in the body of his Last Will and Testament. Therein, Isom makes a special contingency provision should the disposition to his daughter fail. Knowing that his son, Donald Fuselier, was legitimate, he inserted no such clause as to that individual. One must wonder why Isom felt that special provisions in the will were necessary in Linda's case. Isom probably felt that his testamentary disposition to Linda would not stand because, in fact, there had been no marriage between Daisy and himself.
I feel that the case of Succession of Rossi, 214 So.2d 223, (La.App. 4th Cir. 1968), writ refused 253 La. 66, 216 So.2d 309 (1968)"On the facts found by the Court of Appeal the result is correct"is somewhat analogous to the case before this court. In Rossi a man and woman lived together in open concubinage before allegedly contracting marriage. The Court of Appeal held that the presumption of marriage resulting from co-habitation and general reputation was destroyed because of the parties' living in such a fashion. While I do not intend to imply that the same facts are found in the case at hand, the analogy lies in that the Court did not find the presumption of marriage applicable and operative. Therefore the Court was required to proceed with a "non-presumption" factual analysis. In Rossi the "wife" claimed that she and the decedent drove to Texas and were married by a Justice of the Peace in the presence of two witnesses. She placed the date in September of 1936 but could not remember in exactly what town the marriage ceremony was performed. As in the instant litigation, the "husband" in Rossi placed the marriage certificate in his pocket and allegedly never showed it to his "wife". The "wife" left her "husband" and married another individual not seeking a divorce from her prior "spouse". In finding that there had been no valid marriage or putative marriage between the parties, the court stated:
". . . no documentary proof of marriage was introduced not, with the sole exception of the testimony given by Darlene Rossi herself, is there any competent or credible evidence that the alleged marriage was contracted or that any formalities were observed."
In the litigation at hand I feel that the entire decision turns upon one issue, namely the credibility of Daisy Davis. Not only did the trial judge refuse to believe Daisy's testimony, he found her account of the alleged marriage and subsequent relationship with Isom "incredible". The trial judge made reference to the witness' demeanor and was in a unique position to evaluate the credibility of Daisy's testimony. The majority opinion is woefully lacking in substantial factual bases for its "prima facie findings" of the legitimacy of Linda Marie Fuselier and the "marriage" between Daisy Davis and the decedent. As I have already stated, it is my opinion that the so-called presumptions relied upon by the majority are non-existent in a factual situation of this kind. Therefore the majority must reach the conclusion that the *310 trial judge's findings constitute manifest error.
However, when the credibility of a witness is at issue the findings of the trial court must be given great weight. This is a basic principle of our state's jurisprudence. Uddo v. House of Nine, Inc., 299 So.2d 543 (La.App. 4th Cir. 1974). In the case of Canter v. Koehring Company, 283 So.2d 716 (La.1973), the Supreme Court clearly defined the limits of appellate factual review:
". . . the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." (Citations omitted).
Bound by the guidelines set forth in Canter I feel that a finding of manifest error in this case is unwarranted.

CONSTITUTIONAL ISSUE
While footnote 5 of the majority opinion concerning the constitutionality of Louisiana's scheme of inheritance laws does not constitute a part of the majority opinion I cannot let it pass unchallenged. My esteemed colleague, the author of the majority opinion, states that he feels that Article 1483 of the Louisiana Civil Code exists in violation of the equal protection clause of the 14th amendment to the U.S. Constitution.
I feel strongly that the United States Supreme Court has spoken very clearly on the issue in the case of Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971). While the Labine case may be somewhat factually distinguished from the current litigation, I do not believe that such minor factual differences would form the basis for a reversal of the position taken by the United States Supreme Court on the matter. In Labine, writing for the majority, Justice Black stated:
". . . the power to make rules to establish, protect, and strengthen family life as well as to regulate the disposition of property left in Louisiana by a man dying there is committed by the Constitution of the United States and the people of Louisiana to the legislature of that State. Absent a specific constitutional guarantee, it is for that legislature, not the life-tenured judges of this Court, to select from among possible laws." (Emphasis added).
The United States Supreme Court has said explicitly that the 14th amendment to the United States Constitution does not prohibit Louisiana's differential treatment of legitimate and illegitimate descendants. Further, the Court has held that it is the duty of the Legislature to "select from among possible laws". Our Court has previously adhered to the rationale enunciated in Labine. Succession of Sharbino, 285 So.2d 545 (La.App. 3rd Cir. 1973).
I further disagree with the author of the majority opinion in his speculation that Justice Harlan would have sided with the minority had the facts of this case been presented rather than those in Labine. Even in view of Civil Code Article 1483 a father is not completely estopped from having his illegitimate child inherit from him. Under Civil Code Article 198 the father can automatically legitimate the child by marrying that child's mother, or based upon the provisions of Civil Code Articles 214 et seq., the father may adopt his child who will then enjoy all the rights of a legitimate descendant. I also feel that Justice Harlan's concurring opinion was provoked by the philosophical discourse of the dissenters in Labine rather than by any feelings of inadequacy about the majority ruling.
*311 Thus, it is my opinion that Louisiana's scheme of inheritance laws has withstood the attack of a frontal constitutional assault. Since the constitutional issue has been laid to rest, I strongly disagree with the suggestion of the majority's author (in view of the very nature of our civilian legal system) that the judiciary should initiate changes in purely legislative matters, regardless of any ideologies which may permeate our feelings. My contention is fully supported by the language of the U.S. Supreme Court in Labine, supra, which is so profound that I am compelled to reiterate my position by quoting it again:
". . . the power to make rules to establish, protect, and strengthen family life as well as to regulate the disposition of property left in Louisiana by a man dying there is committed by the Constitution of the United States and the people of Louisiana to the legislature of that State. Absent a specific constitutional guarantee, it is for that legislature, not the life-tenured judges of this Court, to select from among possible laws."

ALTERNATIVE ISSUES PRESENTED
Having reached the above conclusions, I would consider two alternate issues raised by the appellant, to-wit:
1. The constitutionality of Louisiana's inheritance laws under Article 1, Section 3 of the new Constitution of the State of Louisiana (1974).
2. Appellant's entitlement to receive alimony from the decedent's estate in the event she is not found to be a legitimate heir of the decedent.

The State Constitutional Issue
Article 1, Section 3 of the 1974 Constitution of the State of Louisiana, reads:
"No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations." (Emphasis ours).
In Labine, supra, the U.S. Supreme Court held that the state of Louisiana alone is empowered with the authority to determine its own system of inheritance laws, including the right to establish certain classes of heirs. The Civil Code mandates that a differentiation be made between legitimate and illegitimate heirs. Apparently, then, the only restrictions placed upon the state legislature in this area are those imposed by Louisiana's recently adopted constitution. Thus eventually a determination must be made as to whether our inheritance laws arbitrarily, capriciously, or unreasonably discriminate on the basis of birth.
However, in view of the clear provision of Article 14, Section 26[6] I find that the Constitution of 1974 is inapplicable to this litigation. It is evident that any of the appellant's claims to property or succession rights from the decedent preceded the effective date of the Constitution of 1974. Art. 14, Section 35.[7]

*312 Appellant's Claim for Alimony

In his ruling on this final issue the trial judge engaged in a scholarly analysis of the relevant codal provisions, and I agree with his reasoning.
Both Civil Code Articles 1483 and 919 refer to the chapter of the Civil Code entitled Of Father and Child to determine when and to what degree alimony is due a natural child.
The Code Articles in this chapter generally set forth the natural child's right to claim alimony and the conditions necessary for this right to be exercised. Under Civil Code Articles 240 and 241 a natural child has a right to claim support and sustenance from his parents and his parents' heirs.
However, the following codal provisions, Articles 242 and 243 limit this right as follows:
"Art. 242. Conditions governing claim to alimony
But in order that they may have a right to sue for this alimony, they must:
1. Have been legally acknowledged by both their father and mother, or by either of them from whom they claim alimony; or they must have been declared to be their children by a judgment duly pronounced, in cases in which they may be admitted to prove their paternal or maternal descent;
2. They must prove in a satisfactory manner that they stand absolutely in need of such alimony for their support."
"Art. 243. Termination of duty to pay alimony
The obligation of giving such alimony ceases, when the illegitimate child is able to earn his subsistence by labor, or whenever his father or mother have [has] caused him to be instructed in an art, trade or profession fit to procure him a sufficient livlihood [livelihood], unless some continual sickness or infirmity prevents such child from working for his subsistence.
The debt of alimony ceases likewise to be due from the estate of the father or mother of the illegitimate child whenever either of them has provided during his or her life a sufficient maintenance for his or her illegitimate child, or have made to him donations or other advantages which may be sufficient for that purpose."
Quoting from the trial judge's opinion (Tr. p. 127):
"Thus it is apparent that regardless of the ability of the parent to provide, there must be a `need' on the part of the illegitimate. Apparently, if this `need' is extinguished, the `right' to receive disappears; and, there is no longer a `right' to receive, nor an ability to even give under Article 1483. Such is the import of Succession of Haydel, 188 La. 646, 177 So. 695, (1937); and Succession of Vincent, 229 So.2d 449 (1970)."
The evidence reveals that the appellant earns a gross salary of $486.00 per month and that her husband earns a gross salary of $640.00 per month. I agree with the trial judge that although the appellant is far from wealthy, she is not in "need" as contemplated by the Civil Code Articles relevant to alimony. Therefore, if this issue were reached, the appellant's claim for these benefits would necessarily fall.
For the above and foregoing reasons I would affirm the judgment of the district court, and therefore respectfully dissent.
NOTES
[1] The dispositive provisions of the will are as follows:

"1.
"To my beloved wife, Grace McGee, I give and bequeath all of my interest in our present residence, including house and lot, and all appurtenant structures; in all household furnishings and appliances situated therein at my death; and in all motor vehicles and sporting equipment which I may then own; and all funds then on deposit or in my possession.
"2.
"The remainder of my estate I give to my son Donald Fuselier and to my daughter Linda Marie Fuselier (Mrs. Andre Sharpe [sic]), or, if they predecease me, to their decendants [sic] by root, in equal portions.
"3.
"Should the bequest to my said daughter fail, then I desire that the disposition to her be treated as the establishment by me of the measure of alimony and support to which she is entitled under the law, andto the extent that it is not so treatedI give and bequeath to my said wife the portion destined for my daughter under this will.
"4.
"The legitime of my forced heirs shall be satisfied first from my movable property."
[2] LSA-C.C. Article 1483 provides as follows:

"Natural children or acknowledged illegitimate children can not receive from their natural parents, by donations inter vivos or mortis causa beyond what is strictly necessary to procure them sustenance, or an occupation or profession which may maintain them, whenever the father or the mother who has thus disposed in their favor, leaves legitimate children or descendants.
"Those donations shall be reducible in case of excess, according to the rules laid down under the title: Of Father and Child."
[3] See: Succ. of Thomas Rockwood et al., 231 La. 521, 91 So.2d 779 (1956); Succ. of Anderson, 176 La. 66, 145 So. 270 (1932); Succ. of Jacobsen, 182 La. 151, 161 So. 185 (1935); Jackson v. United Gas Public Service Co., 196 La. 1, 198 So. 633 (1940); In re Gray's Succession, 201 La. 121, 9 So.2d 481 (1942).
[4] See: Cameron v. Rowland, 208 La. 663, 23 So.2d 283 (1945).
[5] The ratio decidenti of this opinion obviates the necessity of considering the constitutional issue that might otherwise need to be dealt with in this case. However, by use of this footnote the author of this opinion (who has spoken for a majority of the court above but who now speaks only for himself) takes the liberty of making the following observations:

I believe that Article 1483 of the Louisiana Civil Code is violative of the equal protection clause of the Constitution of the United States. Notwithstanding the 5 to 4 vote of the Supreme Court of the United States in Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971) (wherein Mr. Justice Harlan cast the fifth vote in a concurring opinion) I believe the facts of this case would have provoked a totally different result and I believe that Mr. Justice Harlan would have decided Labine differently if, as in this case, the decedent had specifically and categorically bequeathed his estate to his only beloved daughter by clear, unequivocal testamentary disposition.
In Labine, Mr. Justice Brennan speaking for Justices Douglas, White, Marshall and himself inveighs against the "[discarded] moral prejudices of bygone centuries" which expresses my own feeling in far more eloquent terms than I could have authored.
These observations do not detract in any way from my admiration of those gifted French lawyers, judges and legal scholars who were the redactors of our Code. They were worldly and worldly-wise during their moment in history and their codification of the law in such critically important and complicated areas as legitimacy and succession rights has, in many important ways, withstood the relentless and inexorable tests of time.
Yet, I believe that our Civil Code must be interpreted in the bright reflected light of the Constitution and I believe that the constitutional safeguard of equal protection connotes an ever changing, always vibrant quest for fairness and impartiality in the administration of justice. When I apply that criteria to Joseph Isom Fuselier's great effort to call his only daughter, whom he obviously loved and admired, to his succession, I would conclude that his explicit testamentary desire should prevail, regardless of Linda's legitimacy.
[1] See the majority opinion, footnote 1, for the body of the testament.
[2] Art. 1483. Natural or acknowledged illegitimate children, capacity to receive when legitimate descendants exist.

Natural children or acknowledged illegitimate children can not receive from their natural parents, by donations inter vivos or mortis causa beyond what is strictly necessary to procure them sustenance, or an occupation or profession which may maintain them, whenever the father or the mother who has thus disposed in their favor, leaves legitimate children or descendants.
Those donations shall be reducible in case of excess, according to the rules laid down under the title: Of Father and Child.
[3] Art. 952. The incapacity of heirs is not presumed. He who alleges it must prove it.
[4] Succession of Navarro, 24 La.Ann. 298 (1872); Melancon v. Sonnier, 157 So.2d 577 (La.App.3rd Cir. 1963).
[5] Howard v. Ingle, 180 So. 248 (La.App.2nd Cir. 1938).
[6] Section 26. Except as otherwise specifically provided in this constitution, this constitution shall not be retroactive and shall not create any right or liability which did not exist under the Constitution of 1921 based upon actions or matters occurring prior to the effective date of this constitution.
[7] Section 35. This constitution shall become effective at twelve o'clock midnight on December 31, 1974. The secretary of state shall promulgate the results of the election by publication in the official state journal on the thirtieth day prior thereto; however, he shall announce the results of the election within thirty days after the date of the election at which the constitution is submitted to the people.